(No. 49953.—

YOLANDA JARDINE, Appellee, v. ARTHUR RUBLOFF *et al.*—(Otis Elevator Company, Appellant; Arthur Rubloff *et al.*, Appellees.)

*Opinion filed Sept. 19, 1978.—Rehearing denied Dec. 1, 1978.*

McKenna, Storer, Rowe, White & Farrug, of Chicago (Charles P. Menges, Robert S. Soderstrom, and Robin J. Omahana, of counsel), for appellant.

John D. Hayes & Associates, Ltd. and Burton F.

Natarus, of Chicago, for appellee Yolanda Jardine.

Sweeney & Riman, Ltd., of Chicago (Elliot R. Schiff, Francis J. Marasa, and Marvin Riman, of counsel), for appellees Arthur Rubloff, Stanley Goodfriend and George Dovenmuehle.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Plaintiff, Yolanda Jardine, filed a two-count complaint in the circuit court of Cook County seeking recovery for personal injuries sustained on December 12, 1969, when she fell while alighting from an elevator allegedly malfunctioning in its leveling system. Count I charged Arthur Rubloff & Company (Rubloff) and Arthur Rubloff, Stanley Goodfriend, and George Dovenmuehle, co-partners doing business as Carl Sandburg Center (Sandburg Center), with negligence in the ownership, operation, maintenance, management and/or control of the elevators thereby breaching their duty as common carriers of passengers. Count II charged Otis Elevator Company (Otis) with negligence in furnishing and installing elevator equipment and with negligence in maintaining the elevator system. Plaintiff twice amended her complaint, increasing the *ad damnum,* making more definite and certain the allegations of negligent conduct, and adding a third count against Otis for defective manufacture and design.

Rubloff and Sandburg Center filed a two-count countercomplaint against Otis seeking indemnity for any judgment against them in favor of plaintiff. Count I was predicated on the elevator maintenance contract with Otis. Count II sought relief on the common law active-passive negligence theory. They also filed an amended countercomplaint adding an additional count seeking relief against Otis for any liability imposed upon them arising from any defect in the manufacture or design of the elevator system.

The jury returned a verdict in favor of plaintiff and against Rubloff and Sandburg Center in the amount of $65,000, but found against plaintiff and in favor of Otis. The jury also rejected the counterclaim of Rubloff and Sandburg Center against Otis. Judgment was entered on the verdict, and the post-trial motions for judgments notwithstanding the verdict or, alternatively, for a new trial by plaintiff and counterplaintiffs, Rubloff and Sandburg Center, were denied. Following entry of judgment on the verdict and the denial of the post-trial motions, plaintiff entered into a loan agreement with Rubloff and Sandburg Center for $45,000 in consideration for their promise to refrain from pursuing their appeal against plaintiff while permitting the plaintiff to pursue her appeal against Otis. The appellate court affirmed the judgment against Rubloff and Sandburg Center but reversed the judgments in favor of Otis. It determined that the verdicts were against the manifest weight of the evidence, and entered judgment notwithstanding the verdict in favor of plaintiff for $65,000 and in favor of Rubloff and Sandburg Center on the counterclaim for indemnity, also for $65,000. (51 Ill. App. 3d 492.) We granted Otis' petition for leave to appeal under Rule 315 (65 Ill. 2d R. 315).

At the outset we hold that the appellate court did not apply the proper standard in entering judgments *n.o.v.* against Otis. The appellate court held:

"By the testimony of the witnesses, the non-levelling condition of the elevator existed and went undiscovered at a time when Otis admits it conducted numerous weekly inspections. Since Otis knew or should have known, by such inspections, of the non-levelling condition of the elevator yet failed to repair said condition, the evidence manifestly favors a finding that Otis breached its obligation to the plaintiff. The contrary verdict of the jury, for Otis and against the plaintiff, must be set aside and judgment

notwithstanding the verdict must be entered in plaintiff's favor. (51 Ill. App. 3d 492, 497.)

That disposition is in contravention of the standard established in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, to be used in determining when a trial court should enter a directed verdict or a judgment *n.o.v.* in a jury case. It was said there that a judgment *n.o.v.* may be granted "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d 494, 510.) This court recently noted in *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, the distinction between the standard for the direction of verdicts and that for the granting of new trials:

"The standards relating to the direction of verdicts and to the granting of new trials are of course different. In *Pedrick* this court declared: 'We have rather carefully preserved the distinction between the evidentiary situation which will require a new trial [citation], and that justifying direction of a verdict or judgment *n.o.v.* There is, in our judgment, excellent reason for so differentiating to be found in the radically different results of allowance of the two motions, and *we believe a more nearly conclusive evidentiary situation ought to be required before a verdict is directed than is necessary to justify a new trial.'* (*Pedrick v. Peoria and Eastern R.R. Co.,* 37 Ill. 2d 494, 509-10.) *On a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. Heideman v. Kelsey,* 414 Ill. 453, 466; *Millikin National Bank of Decatur v. Shellabarger Grain Products Co.,* 389 Ill. 196, 200; *Hunt v. Vermilion County*

*Children's Home,* 381 Ill. 29, 34; 3A Nichols, Illinois Civil Practice sec. 3887, at 402 (1961)." (Emphasis added.)

Plaintiff argues that even if the evidence supports the verdict to some extent so that a judgment *n.o.v.* is improper, it nevertheless may be appropriate to order a new trial. Thus, we turn now to the question of whether the plaintiff is entitled either to a judgment *n.o.v.* or, in the alternative, to a new trial. The verdict in favor of plaintiff against Rubloff and Sandburg Center is not at issue.

Plaintiff had resided at 1355 North Sandburg Terrace in Chicago since 1963. The building had three elevators. Plaintiff used the service elevator, as required by the building rules, when she walked her dog. She walked the dog at least once a day. On Friday, December 12, 1969, she entered the service elevator and rode to the first floor. Plaintiff testified that the elevator stopped completely, one inch below the floor level. As she lifted her foot to step out, the elevator jerked, her heel hit the first-floor landing, and she was pitched forward against the wall and door frame opposite the elevator.

Otis had entered into a contract with Rubloff and Sandburg Center to maintain the elevators at 1355 Sandburg Terrace. Otis also had designed, manufactured and installed the elevators. William Arbuthnot was the Otis elevator mechanic assigned to maintain the approximately 20 to 24 elevators in Sandburg Center, including the three at 1355 North Sandburg Terrace. In addition, he maintained the four elevators at the Ambassador Hotel. He was the only elevator maintenance man Otis had assigned to Sandburg Center on a full-time basis in 1969. His working hours were from 8 a.m. to 4:30 p.m. five days a week. If any problems arose after 4:30 p.m., Sandburg Center contacted the Otis office or answering service, which would then get in touch with Arbuthnot or the next

available maintenance man to take care of them. Otis did not maintain an office in Sandburg Center.

Arbuthnot's duties under the full maintenance contract were to keep the elevators in good working condition. He performed preventive maintenance to ensure that malfunctions did not occur. Equipment was replaced before trouble developed. A full maintenance contract, as opposed to some other type of maintenance contract, covered the whole system as opposed to enumerated parts, grease and oil. Each morning Arbuthnot reported to the office of Joseph Downey, the operations manager at Sandburg Center, to see if there were any complaints. As a matter of routine, he performed maintenance on each of the elevators at 1355 Sandburg Terrace once a week. He used a check list provided by Otis which recommended checking the parts of certain equipment at specified intervals: once a week, once a month, quarterly or semiannually, or the like.

Arbuthnot made sure he checked the leveling operation in each elevator once a week by riding the elevator and by checking the leveling machinery. He rode each elevator and checked the leveling at various floors at random. He did not keep a record of which elevator he checked on which day or which floors he checked on each elevator on a particular day. He did not check every elevator every week to determine if it stopped level with every floor.

The leveling equipment included a rod with an adjustable cam for each floor to control the stopping level at that floor. This equipment is located in a miniature elevator in the elevator machine room. If the cam is out of adjustment, it will not correct itself. Since there is a separate cam for each floor, a cam out of adjustment at one floor does not affect the stopping level at another floor. A stopping contact exists for each direction of the cam. As the elevator descends, the contact comes off, the

brake is applied, and the elevator stops. If the elevator travels past the level of a particular floor, it will contact the opposite direction. The brake will be lifted and reapplied when a level condition is reached. This would occur practically instantaneously. Once the elevator is stopped, it will not move unless the doors are closed. However, as the elevator approaches the leveling zone of the floor at which it is going to stop, the door may start to open before the elevator comes to a complete stop. The doors open more quickly than they close. Otis originally set the cams and the speed and timing for the opening and closing of the elevator doors. Any adjustments to the equipment were performed by the Otis mechanic, not the building janitors, who had nothing to do with the elevator's mechanical equipment.

Shortly after the accident, plaintiff was taken downstairs on the service elevator in a chair on casters. The chair rolled onto the elevator without difficulty, according to the operations manager and the general building superintendent. They then rode the elevator with a janitor to see if it leveled properly at the first floor and testified that it leveled perfectly or almost perfectly.

Plaintiff testified that the elevator had rarely stopped level with the first floor for a long time prior to the accident, although the last time she reported the nonleveling was 30 to 45 days prior to the accident. The operations manager did not remember specific complaints from plaintiff about nonleveling in the service elevator but testified that ordinarily the person at the complaint desk referred any complaints about the elevators to Otis. Susan Wyle, a tenant at 1355 Sandburg Terrace, used the service elevator whenever it answered her call before the other elevators. She testified she stubbed her toe and tripped when alighting from the elevator at the first floor in November 1969. When next she used the elevator, she observed that it stopped one inch below the first-floor

level. In late November or early December, she again tripped while alighting. She did not recall observing the nonleveling between her second fall and the day she left for her vacation on or about December 16, 1969. A janitor, Michael Breski, testified there was some problem with the elevator a month or two prior to the accident which should have been corrected before December 12, 1969. In a statement made in 1972, he said there were complaints concerning nonleveling. Both at trial and in 1972 he indicated he was not certain of the nature of the problem. Otis' records did not indicate that any adjustments to the cam, which controlled leveling at the first floor, had been made between May 3, 1969, and the Monday following the accident.

When Arbuthnot, the Otis maintenance man, reported to the operations manager's office at 8 a.m. on the Monday following the accident, he was told to inspect the service elevator at 1355 Sandburg Terrace because someone had tripped and fallen. Arbuthnot, the operations manager, and a janitor checked the leveling system by riding the elevator and found it satisfactory. Otis considers an elevator to be level if it stops within one-half inch of floor level. Arbuthnot continued to check the system after the operations manager and janitor left. He made an adjustment to the cam because the elevator was below level when six people rode it. The elevator capacity is 2,500 pounds. Otis calculates the weight of each passenger at 150 pounds. A balanced load was set by Otis at 40% of capacity. Arbuthnot testified that cam adjustments are made only when they are necessary for safety. However, he testified that he adjusted the cam to improve the leveling even though the elevator leveled within the Otis standard before the adjustment. Arbuthnot also observed the opening and closing of the elevator doors.

Plaintiff filed two counts against Otis. The first count charged Otis with negligence in installing and maintaining

the elevator and is the only one at issue here. The first question we must resolve concerns the duty that Otis, as the maintainer of the elevator, owed plaintiff. Although owners of buildings with elevators are viewed as common carriers who owe their passengers the highest degree of care (*Rotheli v. Chicago Transit Authority* (1955), 7 Ill. 2d 172, 177; *Hartford Deposit Co. v. Sollitt* (1898), 172 Ill. 222, 225; Illinois Pattern Jury Instructions, Civil, No. 100.01 (2d ed. 1971) (hereinafter cited as IPI Civil)), that degree of care has not been applied in this jurisdiction to those who undertake to inspect and maintain elevators; they need only exercise due care. See *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 76, 83; accord, *Rogers v. Dorchester Associates* (1973), 32 N.Y.2d 553, 559, 300 N.E.2d 403, 405-06, 347 N.Y.S.2d 22, 26, 64 A.L.R.3d 993, 998; *Ward v. City National Bank & Trust Co.* (Mo. 1964), 379 S.W.2d 614, 618; *Abernathy v. Otis Elevator Corp.* (Okla. 1975), 533 P.2d 971, 973-75; contra, *Otis Elevator Co. v. Embert* (1951), 198 Md. 585, 600, 84 A.2d 876, 882-83; *Norman v. Thomas Emery's Sons, Inc.* (1966), 7 Ohio App. 2d 41, 43, 218 N.E.2d 480, 482.

We see no reason to impose a higher degree of care on Otis than that imposed on any defendant charged with negligence. Formulations of different standards of reasonable conduct for specific categories of defendants, such as those who deal with elevators, have been criticized in scholarly works:

> "Although the language used by the courts sometimes seems to indicate that a special standard is being applied, it would appear that none of these cases should logically call for any departure from the usual formula. What is required is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances,

demanding only an increased amount of care."
(W. Prosser, Torts sec. 34, at 181 (4th ed. 1971));
accord 2 F. Harper & F. James, Torts sec. 16.13,
at 945 (1956); Green, *High Care and Gross
Negligence,* 23 Ill. L. Rev. 4 (1928); see *White v.
Milner Hotels, Inc.* (1974), 267 Ore. 628, 633-36,
518 P.2d 631, 634-35.)

The pattern jury instruction on ordinary care instructs the
jury to consider a defendant's conduct in the context of
the circumstances shown by the evidence. (IPI Civil No.
10.02 (2d ed. 1971).) It thus takes into account any
special circumstances, such as the nature of elevators,
which would require greater care than in other situations.
Otis' conduct must be tested against the care a reasonably
careful person would use under the circumstances.

Otis undertook by contract to use reasonable care to
maintain the elevators in proper and safe operating
condition. This was the effect of its undertaking at
common law as well. (*Nelson v. Union Wire Rope Corp.*
(1964), 31 Ill. 2d 69, 83.) Specifically, it undertook to
examine the elevator and its parts regularly and system-
atically, to lubricate the machinery, to make adjustments
and repairs, and to replace parts as conditions warranted.
Arbuthnot, Otis' maintenance man, utilized a chart with a
check list provided by Otis when he checked each elevator
every week, including the leveling system. He reported to
the operations manager's office every weekday morning to
receive complaints. Following the accident, Arbuthnot, as
well as employees of Rubloff and Sandburg Center, found
no condition of nonleveling. Arbuthnot did make an
adjustment to the cam to improve the leveling. When six
people rode the elevator, it was somewhat nonlevel,
although it was within the one-half inch range Otis
considers level.

There was some evidence unfavorable to Otis. There
was evidence that adjustments to the cam are not made

unless they are necessary for safety. There was evidence that the service elevator had failed to level in the past, that such a condition is not self-correcting, and that Otis' records did not indicate an adjustment had been made. But plaintiff had not complained of the nonleveling condition since 30 to 45 days before the accident. Susan Wyle did not notice the condition in the 2 to 3 weeks before the accident. The janitor testified that a problem that had existed a month or two prior to the accident, the exact nature of which he was not certain, should have been repaired before plaintiff's fall. Further, the malfunction which plaintiff described as the cause of her fall consisted of a nonleveling followed, after the elevator had come to a complete stop, by a jerking of the elevator. This was a condition different from the simple nonleveling that plaintiff and the tenant, Susan Wyle, testified they had observed earlier. The jury was not compelled to believe the evidence favorable to plaintiff. (*Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 171-72.) On the basis of the evidence before it, the jury could have reasonably concluded that the prior condition of nonleveling had been repaired before the accident, that the condition which caused the accident was new, and that the accident was not the result of Otis' negligence.

It is preeminently the function of the jury to determine the factual question of whether Otis exercised reasonable care under the circumstances. (*First National Bank v. City of Aurora* (1978), 71 Ill. 2d 1, 12.) "A verdict will not be set aside merely because the jury could have found differently or because judges feel that other conclusions would be more reasonable." (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 623; *Murphy v. Messerschmidt* (1977), 68 Ill. 2d 79, 87.) After reviewing all the evidence in its aspect most favorable to Otis, we cannot say that it so overwhelmingly favors plaintiff that no contrary verdict based on that evidence could ever

stand. The trial court properly denied plaintiff's motion for judgment *n.o.v.* Nor can we say that the verdict in favor of Otis and against plaintiff is contrary to the manifest weight of the evidence. Plaintiff, therefore, is not entitled to a new trial.

It is plaintiff's thesis, as well as that of Rubloff and Sandburg Center, that the duties of Otis are coterminous with the duties of Rubloff and Sandburg Center, and that since the jury found Rubloff and Sandburg Center negligent, it had to find Otis negligent. The nature of the relationship between Otis and Rubloff and Sandburg Center defeats that assertion. We also bear in mind that the question of Rubloff and Sandburg Center's liability is not before us.

The maintenance contract specifically provided that Otis did not assume possession or control of the equipment. The janitors and other employees of Rubloff and Sandburg Center were instructed to watch for and report elevator malfunctions such as shaking and obvious non-leveling to Otis. The general superintendent testified a one-inch nonleveling is obvious. The head janitor had a key and was authorized to shut down the elevator in the event of mechanical failures. The janitors vacuumed the elevators and rode the service elevator in the course of cleaning the building. Under the contract, Otis was to perform all work during regular working hours on regular working days. If problems arose outside Arbuthnot's regular work times, Sandburg Center was to call Otis, which would then contact and send Arbuthnot or the next available repairman to correct the problem. Only if two or more elevators were shut down did the contract provide for overtime service without additional cost. Otis did not have an office at Sandburg Center and did not keep a person on the premises 24 hours a day.

Between weekly inspections and before and after regular working hours, the building employees were the

only ones who could have discovered malfunctions. The jury could have found that the malfunction occurred at a time when Rubloff and Sandburg Center alone were in a position to guard against accidents, for example, by taking the elevator out of service. Because Rubloff and Sandburg Center had duties different from those of Otis, a finding that Otis was not negligent does not preclude a finding that Rubloff and Sandburg Center had breached their retained duties. Furthermore, the jury was instructed that Rubloff and Sandburg Center had a nondelegable duty to exercise the highest degree of care, but that Otis had only the duty to exercise reasonable care. The highest duty of care imposed on Rubloff and Sandburg Center may explain the finding that Rubloff and Sandburg Center were negligent.

The final issue is whether Rubloff and Sandburg Center are entitled to common law indemnity from Otis based on the distinction between active and passive negligence. The appellate court found that Rubloff and Sandburg Center were passively negligent and therefore entitled to indemnity from Otis, which it found was the active tortfeasor. Because we have affirmed the jury's finding that Otis was not negligent, we need not determine whether Otis should be compelled to indemnify Rubloff and Sandburg Center on a theory of active negligence.

For the reasons given, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. CHIEF JUSTICE WARD took no part in the consideration or decision of this case.