Margaret DAVLAN, Plaintiff-Appellee,

v.

OTIS ELEVATOR COMPANY, Defendant-Appellant.

No. 86–1746.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1987.

Decided April 1, 1987.

Rehearing Denied May 1, 1987.

Richard E. Boyle, Gundlach, Lee, Eggmann, Boyle & Roessler, Belleville, Ill., for defendant-appellant.

Mary Mansfield Brauer, Cook, Shevlin, Keefe & Chatham, Ltd., Belleville, Ill., for plaintiff-appellee.

Before WOOD, and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, JR., Circuit Judge.

Plaintiff Margaret Davlan injured her back as she attempted to step into an elevator. The elevator allegedly failed to level with the floor at which it had stopped, which caused plaintiff to trip and fall onto her side. Plaintiff brought this diversity suit for strict liability in tort against the manufacturer of the elevator, Westinghouse Electric Corporation, and for negligence against the maintainer of the elevator, Otis Elevator Company, the two defendants to this lawsuit. At the conclusion of a jury trial, the jury returned a verdict in favor of Westinghouse, but against Otis. The verdict against Otis was in the amount of $105,195.40, reduced by plaintiff's comparative negligence of 25% ($25,298.85), for a resulting verdict of $78,896.55. The magistrate who presided over the case denied Otis's post-trial motions for judgment notwithstanding the jury's verdict or for a new trial and entered judgment on the jury's verdict. Otis appeals the denial of its post-trial motions.

## I. FACTUAL BACKGROUND

Plaintiff worked at the St. Clair County Sheriff's Department in Belleville, Illinois, located in the St. Clair County Building. On November 3, 1982,[1] plaintiff parked her automobile in the subbasement of the county building. She then walked to the bank of three passenger elevators to ride up to the sheriff's offices on the first floor. Plaintiff was alone. She pressed the button to call an elevator. Plaintiff testified she looked at the individual floor lights above the elevators to determine which elevator was coming down first, floor-by-floor, to the subbasement. She later admitted, however, that the only visual indicator in the subbasement was "an arrow-type light" at chest-level, not a separate light for each floor above the elevators. Plaintiff stepped in front of the first elevator and, without looking down, attempted to step into it when the doors opened. She testified: "I went to enter into the elevator and caught my foot on the floor of the elevator and fell." As plaintiff fell onto her right side, she testified she quickly twisted around and saw that the elevator floor was five or six inches higher than the level of the subbasement floor. Plaintiff arose and pressed the elevator button to take her to the first floor. When the elevator's doors opened at the first floor, plaintiff stepped out and noticed that the elevator was level with the first floor.

When she finished work that evening, plaintiff went to see a plastic surgeon with the idea that he could refer plaintiff to another physician, perhaps even a specialist. Instead, the plastic surgeon advised plaintiff to take physical therapy. Plaintiff

1. A year or two prior to her fall in the elevator, plaintiff injured her back while lifting books up onto a counter in the sheriff's office. Also, one of plaintiff's co-workers testified that, within the week prior to plaintiff's fall in the elevator, plaintiff told her she had hurt her back that morning as a result of a fall in her bathtub.

took the plastic surgeon's advice and received heat and massage treatment for five consecutive days. She also testified she "missed a few days" of work. Plaintiff did not seek or receive any other treatment or miss any days of work on account of her back condition, however, until October 1983, nearly a year after she completed the physical therapy. In October 1983 plaintiff sought additional treatment for her back. She missed a week of work. Plaintiff attempted to return, but then missed three and one-half months of work. At the end of this time away from work, in January 1984, plaintiff filed this lawsuit against Westinghouse and Otis, claiming in excess of $15,000 against each. However, her evidence for lost wages amounted to $2800 and her medical expenses were $4065.90, a total of less than $7000.

## II. LEGAL STANDARDS

Otis argues that the magistrate improperly denied its motions for judgment notwithstanding the verdict of the jury and for a new trial. The magistrate's disposition of these alternative motions and our review on appeal are governed by divergent legal standards.

■ As for our review of the magistrate's denial of defendant's motion for judgment notwithstanding the verdict of the jury, "the standard to be applied by the court of appeals is the same as that applied by the trial court." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 281 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). In other words, our review is *de novo*. That standard applied by a district court in a diversity case and by us on appeal, is created by the law of the forum state. *Cook v. Hoppin*, 783 F.2d 684, 693–94 (7th Cir.1986); *F.W. Hempel & Co. v. Metal World, Inc.*, 721 F.2d 610, 613 (7th Cir.1983). In Illinois a trial judge, or in this case the magistrate, can grant a motion for judgment notwithstanding the verdict of the jury "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that

evidence could ever stand." *Pedrick v. Peoria & Eastern Railroad*, 37 Ill.2d 494, 229 N.E.2d 504, 513 (1967); *Jardine v. Rubloff*, 73 Ill.2d 31, 21 Ill.Dec. 868, 870, 382 N.E.2d 232, 234 (1978).

■ Our review of the magistrate's denial of defendant's motion for a new trial, on the other hand, is governed by federal law. *Cook v. Hoppin*, 783 F.2d 684, 687–88 (7th Cir.1986). In this circuit, our review of a disposition of a motion for new trial is governed by the abuse of discretion standard. *Id.; Robison v. Lescrenier*, 721 F.2d 1101, 1104 (7th Cir.1983) ("Since 'a motion for a new trial is addressed to the sound discretion of the trial judge,' the standard of review is abuse of that discretion.") (quoting *Durant v. Surety Homes Corp.*, 582 F.2d 1081, 1088 (7th Cir.1978)).

"Under the 'abuse of discretion' standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether *any* reasonable person could agree with the district court." *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984) (emphasis in original). In other words, "if reasonable men could differ as to the propriety of the [district] court's action, no abuse of discretion has been shown." *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 796 (7th Cir.1980).

Under federal law, a new trial can be granted only when the jury's verdict is against the clear weight of the evidence. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); *First National Bank v. United States*, 763 F.2d 891, 896 (7th Cir.1985). Thus, our review on appeal is determining whether the magistrate abused his discretion in concluding that the jury's verdict was not against the clear weight of the evidence.

Finally, in reviewing these alternative motions we must examine the facts to some extent. If we set aside any of the magistrate's findings of fact, we may only do so in accord with the strictures of Rule 52: "Findings of fact, whether based on oral or

documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a).

## III. DISCUSSION

### A. Judgment Notwithstanding the Jury's Verdict

Otis first argues that the magistrate improperly denied its motion for judgment notwithstanding the verdict of the jury because plaintiff did not meet her legal burden of proving negligence on Otis's part.[2]

The elements of common law negligence are described and governed by state law. A federal court deciding a diversity negligence case must apply the same state's law that the forum state would apply. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 531 (7th Cir.1985). Illinois would apply its own law to this negligence claim. *E.g., Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593, 595 (1970) ("In our opinion, the local law of the State where the injury occurred should determine the rights and liabilities of the parties, unless Illinois has a more significant relationship with the occurrence and with the parties, in which case, the law of Illinois should apply.").

"For a defendant to be liable for the tort of negligence [in Illinois], he must have had a duty towards plaintiff, defendant must have breached that duty, the breach must have been the proximate cause of the plaintiff's injury and there must be a resulting compensable injury." *Illinois Housing Development Authority v. Sjostrom & Sons, Inc.*, 105 Ill.App.3d 247, 61 Ill.Dec. 22, 31, 433 N.E.2d 1350, 1359 (2d Dist. 1982). Plaintiff, therefore, must establish each of the four elements of negligence to recover against Otis as the maintainer of the elevator in which plaintiff was injured. Otis argues that, as a matter of law, plaintiff did not make out a *prima facie* case of negligence against Otis because even viewing the evidence in the light most favorable to plaintiff she failed to establish one or more of the four elements of negligence.

### 1. Duty

■ The first element of a negligence claim is duty. This duty is "the legal obligation imposed upon one for the benefit of another," *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill.2d 552, 328 N.E.2d 538, 540 (1975), that requires "one to conform to a certain standard of conduct for the protection of another against an unreasonable risk." *Barnes v. Washington*, 56 Ill.2d 22, 305 N.E.2d 535, 538 (1973).

In most instances, that standard of conduct owed by a defendant to a plaintiff is

**2.** Although we are not squarely presented with the question, we note that this case was not submitted to the jury on the theory of *res ipsa loquitur. See Hahn v. Eastern Illinois Office Equipment Co.*, 42 Ill.App.3d 29, 355 N.E.2d 336, 339 (4th Dist.1976) ("The doctrine [of *res ipsa loquitur*] does not relieve the plaintiff of proving that negligence was the cause of the injury, although it makes proof of negligence easier.") (citation omitted). When questioned at oral argument about why the case was submitted to the jury on the theory of negligence alone, and not on the theory of *res ipsa loquitur*, plaintiff's counsel responded:

We believe it did not quite meet the requirements of res ipsa. There's always the "flying dirt" cause submitted by elevator companies they could use and that wouldn't necessarily be the negligence of Otis. We didn't believe we could have gone on res ipsa.

Because the case was submitted to the jury solely on the theory of negligence, we do not

make any further inquiry into the possible legal ramifications had this case been submitted on the theory of *res ipsa loquitur. See Daniels v. Standard Oil Realty Corp.*, 145 Ill.App.3d 363, 99 Ill.Dec. 284, 287, 495 N.E.2d 1019, 1022 (1st Dist.1986) (although defendant elevator maintainer presented evidence that "the failure of the elevator brake to function properly could have been caused by airborne dirt and that it is not possible to prevent airborne dirt by maintenance," court held evidence of other possible causes of brake failure sufficient to sustain jury's verdict for plaintiff based on *res ipsa loquitur* and negligence); *see also* Annotation, *Liability of Owner or Operator for Injury Caused by Failure of Automatic Elevator to Level at Floor*, 64 A.L.R.3d 1020, 1025 (1975) ("[T]he rule of res ipsa loquitur has been recognized to be particularly applicable to an injury occurring to a passenger of an automatic elevator who trips over an uneven landing.").

the standard of due care. "Due care is that degree of care which ordinarily prudent persons would use under the same or similar circumstances." *Morehead v. Mayron*, 3 Ill.App.3d 425, 279 N.E.2d 473, 474 (1st Dist.1972). In other limited situations, however, a greater degree of care is required of a particular defendant because of the special relationship that defendant has with a particular plaintiff. In the case of common carriers, for example, Illinois has long required a greater degree of care because of the relationship between carrier and passenger of protection on the one hand and trust on the other. *Springer v. Ford*, 189 Ill. 430, 59 N.E. 953, 953–54 (1901).

In this case the question is whether Otis, as the contractual maintainer of the elevator, is subject to the typical standard of due care or to the higher standard of care exacted from common carriers. The Supreme Court of Illinois has answered that question:

> Although owners of buildings with elevators are viewed as common carriers who owe their passengers the highest degree of care, that degree of care has not been applied in this jurisdiction to those who undertake to inspect and maintain elevators; they need only exercise due care.
>
> We see no reason to impose a higher degree of care on Otis than that imposed on any defendant charged with negligence.

*Jardine v. Rubloff*, 73 Ill.2d 31, 21 Ill.Dec. 868, 872–73, 382 N.E.2d 232, 236–37 (1978). Thus, Otis owes a legal duty to its passengers, including plaintiff, to exercise due care. This means that Otis is required to exercise the same degree of care that an ordinarily prudent maintainer of an elevator would exercise under the same or similar circumstances.

### 2. Breach

The second element of a negligence claim is breach of duty. Plaintiff has the burden of demonstrating that Otis breached its duty to plaintiff by not exercising that degree of care that an ordinarily prudent maintainer of an elevator would exercise under the same or similar circumstances.

She cannot merely assert that she was injured on an elevator maintained by Otis and thereby raise an inference of negligence. *See Mort v. Walter*, 98 Ill.2d 391, 75 Ill.Dec. 228, 230–31, 457 N.E.2d 18, 21–22 (1983). Rather, plaintiff must prove negligence by demonstrating Otis in fact breached its legal duty to plaintiff. *E.g., Walling v. Lingelbach*, 33 Ill.App.3d 949, 338 N.E.2d 917, 919 (2d Dist.1975) ("It is not enough for the plaintiff to prove that she was injured or that she was injured because of the negligence of someone. Rather, it is incumbent upon the plaintiff to prove that the negligence of the defendant-appellant caused her injuries."), *aff'd*, 65 Ill.2d 244, 2 Ill.Dec. 363, 357 N.E.2d 530 (1976).

To demonstrate Otis breached its duty, plaintiff must show (1) that Otis had prior knowledge of the problem that caused the elevator's doors to open when the elevator was unlevel and failed to take reasonable steps to correct the problem or (2) that Otis did not use reasonable care in maintaining the elevator by failing to discover, and then correct, a problem that caused the unlevelling. *See Jardine v. Rubloff*, 73 Ill.2d 31, 21 Ill.Dec. 868, 873–74, 382 N.E.2d 232, 237–38 (1978); *Householder v. Prudential Insurance Co.*, 130 Ill.App.2d 184, 264 N.E.2d 398, 400–01 (1st Dist.1970); *Schmelzel v. Kroger Grocery & Baking Co.*, 342 Ill.App. 501, 96 N.E.2d 885, 887 (4th Dist.1951) (holding plaintiff injured by slipping in store must prove "defendant knew of such unsafe condition, or that same existed for a period of time from which it might be inferred that had he been exercising ordinary care he could have learned of same"); *accord Rogers v. Dorchester Associates*, 39 A.D.2d 878, 333 N.Y.S.2d 677, 679 (1972), *modified on factual grounds*, 32 N.Y.2d 553, 300 N.E.2d 403, 347 N.Y.S.2d 22 (1973); *Koch v. Otis Elevator Co.*, 10 A.D.2d 464, 200 N.Y.S.2d 700, 702–03 (1960); *Bernstein v. Highland Associates of Worcester, Inc.*, 1 Mass.App.Ct. 132, 294 N.E.2d 576, 578 (1973); *Otis Elevator Co. v. Robinson*, 287 F.2d 62, 65 (5th Cir.1961) (applying Texas law).

### a. Prior Knowledge

■ In denying Otis's motion for judgment notwithstanding the verdict, the magistrate conceded that plaintiff and another witness had no knowledge of the elevator ever failing to level prior to plaintiff's accident. The magistrate did find, however, that other "witnesses—Johanson, Kuen [sic], Reno, Layman [sic], and Compton—testified that the elevator occasionally had not levelled prior to the accident." The testimony of these five witnesses on which the magistrate relied, however, simply does not exist. None of the five witnesses identified by the magistrate testified that the elevator was ever unlevel prior to plaintiff's accident.

Samuel Johanson was a field superintendent with Westinghouse. He adjusted the elevator cars at the county building just after they were installed. Other than that adjustment, however, he did not testify as to any other experience with the elevators before or after plaintiff's accident.

Anne Keane worked in the sheriff's office at the county building as a court reporter. She rode the elevators frequently. She testified she noticed that the elevators were unlevel on at least two occasions. As to the timing of those occasions, however, she was unclear. During cross-examination she admitted in answer to counsel's questioning:

Q Mrs. Keane, with respect to these two times, can you be any more definite with respect to the point in time that they happened?

A No, I really could not. That has been years ago.

Q Could it be either before or after November 3rd of 1982?

A I could not tell you that, either.

Marvin Reno was a sheriff's deputy for the county. He had occasion from time to time to ride the elevators in the county building even though he worked at the county jail in another building. Sometime before testifying, he had obtained a new position with the county's probation department. Since that time and up to the time he testified, he worked in the county building itself. Mr. Reno testified that in his experience the elevators did not always level before the doors opened. He did not testify, however, whether these incidents occurred before or after plaintiff's accident. He testified only that they had happened.

Darwin Laymen was chief bailiff for the county. He was in charge of security at the county building and was positioned at a desk that faced the elevators on the fourth floor of the county building. Mr. Laymen was charged, for security purposes, with observing the passengers as they stepped into and out of the elevators. He testified he observed the elevators stop and open at unlevel positions "numerous times." He did not become chief bailiff and begin observing the elevators until July 1983, however, nearly eight months after plaintiff had her accident.

Eugene Compton was the maintenance foreman at the county building. He had responsibility for the elevators when they malfunctioned or were in a state of disrepair. Sometime prior to and at the time he testified, Mr. Compton worked in the county building as superintendent of buildings for the county's public building commission. Mr. Compton testified that he had noticed levelling problems from time to time, but did not testify that any of the levelling problems occurred prior to plaintiff's accident.

The magistrate's reliance on this testimony of levelling problems prior to plaintiff's accident is clearly erroneous. The testimony of any unlevelling incident prior to plaintiff's accident does not exist. Because there is no such testimony, as a matter of law Otis cannot be charged with prior knowledge of a levelling problem on the basis of these five witnesses' testimony.

Other than that nonexistent testimony, the only evidence that Otis had prior knowledge of a levelling problem was two entries on a particular "callback, repair, rope report." This report is Otis's record of actions taken by it in response to specific complaints about a particular elevator. Otis maintained the elevators in the county

building from 1978 through 1982, when plaintiff was injured. Otis kept complete callback, repair, rope reports for each one of the three passenger elevators and the one freight elevator in the county building. One of the passenger elevators, but not the one on which plaintiff was injured, had two entries on its callback, repair, rope report for repairs to correct an unlevelling problem over a period spanning four and one-half years. On September 8, 1980, a repairman named "Morris" recorded: "Elev. not leveling at floors. Bad micro sw. on brak Replaced micro sw." On July 29, 1982, a repairman named "Schmitz" recorded: "# 3 not leveling./Replaced contact # 6 relay."

We are unwilling to hold that as a matter of law this evidence put Otis on notice that the elevator on which plaintiff was injured was not levelling properly. This elevator was not the elevator on which plaintiff was injured. It malfunctioned over two years prior to plaintiff's accident and then again three months before the accident. The causes of the malfunctions in both instances appear from the callback, repair, rope report to be dissimilar. The 1980 problem was rectified by replacing a faulty micro switch. The 1982 problem, on the other hand, was remedied by replacing a contact relay. Moreover, the elevator on which plaintiff was injured was inspected and tested without incident several times subsequent to both of these instances of malfunctioning on the other elevator. As a result, we cannot see how these two repair entries put Otis on legal notice that the elevator on which plaintiff was injured was malfunctioning or was about to malfunction.

Thus, plaintiff failed to demonstrate that Otis had prior knowledge of the problem that caused the elevator's doors to open when the elevator was unlevel and she therefore could not charge Otis with failure to correct a problem about which it was unaware.

b. Failure to Discover

Plaintiff also failed to demonstrate that Otis did not use reasonable care in maintaining the elevator by failing to discover, and then correct, a problem that caused the unlevelling. In denying Otis's motion for judgment notwithstanding the verdict, the magistrate held that "circumstantial evidence of failure to correct or discover a condition may be sufficient to infer negligence." He went on to find: "As in *Rogers,* the case turns on a recurring malfunction of the elevator—in the instant case, recurrent non-levelling. Otis had exclusive control of the maintenance of the elevator. 'Whether the door could have malfunctioned, absent negligence in the inspection and maintenance by Otis, was properly a question for the jury....'" (quoting *Rogers v. Dorchester Associates,* 32 N.Y.2d 553, 300 N.E.2d 403, 407, 347 N.Y.S.2d 22, 28 (1973)).

The deficiency in the magistrate's finding is that there is no substantive evidence on the record of "recurrent non-levelling" of the elevator that could give rise to an inference of Otis's negligence. Plaintiff alone testified that the elevator was unlevel at the time of her accident. As we have already discussed, none of the witnesses testified that the elevator was ever unlevel *before* plaintiff's accident. Some of them did testify, however, that the elevator was unlevel from time to time *after* plaintiff's accident. But that testimony was excluded as substantive evidence. It was admitted *for a limited purpose only.*

Otis contended at trial that if an elevator does not level at one floor, it will not level at any other floor until the levelling malfunction is corrected. Otis advanced this contention to cast doubt on plaintiff's story that the elevator was unlevel when plaintiff tripped into the elevator at the sub-basement level, but then was level when she exited at the first floor. Plaintiff directed a large portion of her case toward disputing Otis's contention that an elevator could not experience intermittent levelling problems without intervening maintenance. Plaintiff attempted to do this by eliciting testimony from several witnesses that the elevators were unlevel from time to time. The magistrate limited the testimony of these witnesses to that single purpose and forbade the jury from considering the testi-

mony as substantive evidence of a malfunction on the day of plaintiff's accident. At trial, before each witness testified about episodes of intermittent unlevelling, the magistrate instructed the jury about the limited purpose for which the testimony was being admitted:

Ladies and gentlemen, this evidence is going to be received by you for a limited purpose. You should not consider it for any other purpose. Now, the evidence is admitted for a limited purpose and that is to refute testimony that the elevator could not have leveled on one particular occasion, but subsequently did level without intervening maintenance. It is not to be considered as evidence that the elevator did or did not level on the 3rd of November, the time in question.

As a result, it is difficult for us to determine how the magistrate was able to find that the elevator's operation was marked by "recurrent non-levelling." There was no testimony of nonlevelling prior to plaintiff's accident. And the testimony of nonlevelling subsequent to plaintiff's accident was admitted for a limited purpose that precluded its use as circumstantial evidence of a malfunction on the day plaintiff was injured. The magistrate's finding to the contrary based on this testimony is clearly erroneous.

Apart from the two indications on a callback, repair, rope report of nonlevelling on a different elevator, three other pieces of evidence appear to have some relevance to the issue of whether or not Otis failed to exercise due care in its maintenance of the elevator by failing to discover, and then correct, a problem that caused the unlevelling.

John Donnelly was the manager of an elevator company in Chicago. He was educated as an electrical engineer and had acquired substantial employment, professional, and teaching experience in elevator maintenance over a period of fourteen years at the time of trial. Mr. Donnelly reviewed depositions, work orders, and maintenance schedules relating to Otis's maintenance of the elevator from 1978 to the time of plaintiff's accident. He also inspected the elevator on which plaintiff was injured and took photographs of its mechanical parts. After exhaustively describing the mechanical operation of an elevator generally, Mr. Donnelly testified that Otis's maintenance of the elevator at the county building from 1978 to the time plaintiff was injured had been "excellent." [3]

Mr. Donnelly's testimony tends to show that Otis exercised at least that same degree of care in maintaining the elevator that another maintainer would exercise in the same or similar circumstances. Moreover, Robert Morris, an Otis elevator inspector, testified that the elevator functioned properly the day following plaintiff's accident and that he had not received any complaints about a nonlevelling problem. Plaintiff's counsel suggested at oral argument that Mr. Morris's inspection of the elevator the day following plaintiff's accident was not merely a coincidence, but rather was prompted by the accident. Our review of the record, however, shows oth-

3. Mr. Donnelly testified:

Q Based upon the examination of those records and based upon what you know with reference to this matter, do you have an opinion based upon your expertise in your field as to the quality of the maintenance that was given by Otis with respect to the Courthouse elevators for the period of time from 1978 through 1984, or at least until November 3rd of 1982?
A Yes, I have an opinion.
Q What is that opinion, sir?
A My opinion is that the maintenance of these three elevators, actually four elevators, were in excellent maintenance.
Q Why do you say that, and what do you base that on?

A Well, their maintenance contract called for them to show up every other Friday and spend four to six hours there maintaining and doing the general lubrication, oiling, and greasing, but they also had to answer any problems during the week and they were called call backs. As part of their contract, they had to automatically come out and fix the problem immediately and whenever there was a problem reported to them. Through these call back sheets, they were not related to the quality of the maintenance program. The type of call backs they were having were failures or abuse of the equipment due to the riding public.

erwise. Mr. Morris was responsible for inspecting elevators at ten or fifteen locations. Each inspection took three hours to complete. Mr. Morris inspected each elevator every two weeks—scheduling each inspection sometime within the two-week period, but not necessarily in the same sequence each time. Thus, any particular elevator could be inspected up to three times within a sixteen-day period. Mr. Morris's maintenance records indicate his inspection of the elevators at the county building fell within the normal time frame and was not "skewed" as plaintiff's counsel suggested.

Plaintiff failed to offer any evidence from which the jury could conclude Otis failed to exercise due care in maintaining the elevator. Plaintiff points to two other pieces of testimony in an attempt to show Otis breached its duty, but even in the light most favorable to her position, this testimony is insufficient to allow the jury to conclude Otis breached its duty to maintain the elevator with due care.

Plaintiff points first to an answer given by Mr. Donnelly during cross-examination about the cause of an unlevel elevator in general, but not the elevator on which plaintiff was injured. Speaking about elevators generally, Mr. Donnelly explained that if an elevator fails to level, "[i]t is not properly adjusted. There is a malfunction probably in the electrical system." [4]

Mr. Donnelly gave this testimony after he had provided his opinion of Otis's maintenance of the elevators in the county building; he testified they "were in excellent maintenance." His subsequent testimony—"It is not properly adjusted. There is a malfunction probably in the electrical system."—simply does not sufficiently detract from his previous statement about the quality of Otis's maintenance to create a jury question of whether or not Otis adequately maintained the elevator.

In addition to this one answer of Mr. Donnelly, plaintiff points second to statements made by Samuel Johanson, a field superintendent for Westinghouse. Mr. Johanson offered his opinion on the possible causes of an elevator's failure to level. As to the possible cause of poor maintenance, he testified: "Maintenance comes into a point that it should be detected before the point it causes a problem to be replaced." [5]

4. Mr. Donnelly responded during cross-examination:
   Q  So that I understand, I think ten (10) feet a minute is two inches in a second, is that right?
   A  Yes.
   Q  So, the elevator, in other words, when the doors start to open on these elevators, they are going to be—if they are functioning as they should, they are going to be virtually level within a second after the doors start to open?
   A  That's correct.
   Q  So, if the person can get aboard before the floor is level, there is something wrong with the elevator?
   A  That's correct.
   Q  What is going wrong with the elevator?
   A  It is not properly adjusted. There is a malfunction probably in the electrical system.

5. Mr. Johanson attempted to explain:
   Q  You would expect the micro switches or whatever that was placed in there to control the leveling to last longer than seven years, would you not?
   A  I would think so, yes.
   Q  Are there other mechanical problems that can cause a failure of leveling in terms of the floors coming even?

A  It could be, like I say, mechanically it could be switches that can become mechanically bound up or wore.
Q  What about poor maintenance?
A  Maintenance comes into a point that it should be detected before the point it causes a problem to be replaced.
Q  How should maintenance be able to detect there is a leveling problem that might occur?
A  Most people, elevator mechanics that work around the equipment, they know the areas to be looking after.
Q  Is leveling one of the areas that is of crucial concern?
A  It is of main concern, yes.
Q  Mr. Johanson, what about if there had been reports of intermittent leveling? Should they require as to whether they are not intermittent or not? Let me strike that and start over again.
What could cause an intermittent leveling problem, one that didn't always happen, but happened sometimes?
A  It could possibly be, say, a coil getting out or a bad contact or something of that sort. It would have to be corrected at one time or another.
Q  Is that something proper maintenance should be able to detect?
A  I would think if it was acting up you could detect it easily.

This somewhat garbled testimony does not demonstrate that Otis breached its duty of due care toward plaintiff. Mr. Johanson's testimony assumes the existence of an intermittent levelling problem—a problem about which no substantive evidence was presented to the jury. Moreover, Mr. Johanson testified mechanical problems *or* poor maintenance *could* cause a levelling problem; but he did not testify that a levelling problem did exist on the elevator on which plaintiff was injured and that the levelling problem was a result of Otis's poor maintenance. Thus, Mr. Johanson's testimony does not help plaintiff's case.

We are pointed to no other evidence in the record, and we have found none ourselves, that demonstrates Otis did not use reasonable care, or the care another maintainer would use in the same or similar circumstances, in maintaining the elevator and correcting discoverable levelling problems.

Plaintiff did not show that Otis had prior notice of a levelling problem with the elevator on which plaintiff was injured. Neither did plaintiff show that Otis failed to maintain that elevator in such a manner that it failed to discover and correct an intermittent levelling problem. Therefore, we hold Otis did not breach its duty to plaintiff to exercise due care in maintaining the elevator. Because we hold Otis did not breach its duty, plaintiff has failed to make out a *prima facie* case of negligence. *See Hayes v. Alsburg*, 52 Ill.App.3d 355, 10 Ill.Dec. 180, 182, 367 N.E.2d 568, 570 (4th Dist.1977) ("Proof of an accident does not equate with proof of negligence. The burden is on plaintiff to prove negligence, not on defendants to disprove it."), *aff'd*, 72 Ill.2d 560, 21 Ill.Dec. 875, 382 N.E.2d 239 (1978). Consequently, we do not need to examine the elements of causation and injury.

In sum, we hold that all of the evidence, even when viewed in the light most favorable to plaintiff, so overwhelmingly favors Otis that no verdict of negligence against Otis could ever stand. Otis's motion for a judgment notwithstanding the jury's verdict should have been granted instead of

denied. We therefore reverse on that basis.

### B. New Trial

We have already concluded that Otis's motion for judgment notwithstanding the jury's verdict should have been granted. Otis moved for a new trial only in the alternative. Therefore we do not need to address the parties' new trial arguments.

## IV. CONCLUSION

Plaintiff failed to make out a *prima facie* case of negligence against Otis. Therefore, the magistrate's order denying Otis's motion for judgment notwithstanding the jury's verdict and the judgment entered on the jury's verdict against Otis must be

REVERSED.