# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Mockbee v. Humphrey Manlift Co.*, 2012 IL App (1st) 093189

---

| | |
|---|---|
| Appellate Court Caption | BRENDA MOCKBEE and MICHAEL MERLE MOCKBEE, Plaintiffs-Appellants and Cross-Appellees, v. HUMPHREY MANLIFT COMPANY, INC., Defendant-Appellee (Harris Industries, Inc., and R. Harris Electric, Inc., Defendants-Appellees and Cross-Appellants). |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-09-3189, 1-09-3578 cons. |
| Filed | May 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries plaintiff suffered when she fell into a floor opening that was part of a manlift platform system at her employer's plant, the trial court properly entered summary judgment for defendants, two companies retained by plaintiff's employer to perform safety inspections of the manlift platform system, since defendants were service organizations that provided safety services to plaintiff's employer and, as such, they were entitled to immunity from common law liability for injuries sustained by employees pursuant to section 5(a) of the Workers' Compensation Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-L-9450; the Hon. Mary Mulhern, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Joseph A. Power, Jr., Devon C. Bruce, and Brian Lacien, all of Power Rogers & Smith, P.C., of Chicago, for appellants. |

Mitchell H. Frazen, James R. Branit, and Claudia B. Diaz, all of Litchfield Cavo LLP, of Chicago, for appellee Humphrey Manlift Company.

Robert J. Franco, Christopher G. Buenik, and Christopher M. Cano, all of Bollinger, Ruberry & Garvey, of Chicago, for appellees Harris Industries, Inc., and R. Harris Electric, Inc.

Panel      JUSTICE GARCIA delivered the judgment of the court, with opinion.
Justices McBride and Palmer concurred in the judgment and opinion.

## OPINION

¶ 1      Plaintiffs Brenda Mockbee and Michael Merle Mockbee brought a negligence action against defendants Harris Industries and R. Harris Electric (collectively Harris) and Humphrey Manlift Company after Ms. Mockbee was severely injured in 2002 when she fell into a floor opening that was part of a manlift platform system at the Quaker Oats Company plant in Danville, Illinois, where she worked. The plaintiffs ask this court to reverse the circuit court's grant of summary judgment to Harris and Humphrey. The plaintiffs contend that contrary to the circuit court's ruling, Harris and Humphrey, as safety inspectors of the manlift platform system, each owed Ms. Mockbee a duty of care and breached that duty when their respective inspections failed to note the need for a safety guardrail required by the Occupational Safety and Health Act (OSHA) (29 U.S.C. § 651 (2006)), which issued a violation to Quaker Oats based on the guardrail's absence. We affirm the circuit court's grant of summary judgment to Harris and Humphrey, but on the ground that both are immune from liability for injuries sustained by Quaker Oats employee Mockbee under section 5(a) of the Workers' Compensation Act (Compensation Act) (820 ILCS 305/5(a) (West 2010)), as providers of safety services to the employer as raised in Harris's cross-appeal.

¶ 2                          BACKGROUND

¶ 3      On June 6, 2002, Brenda Mockbee suffered severe injuries when she fell into the first floor opening of a manlift platform system at the Quaker Oats Company plant in Danville, Illinois, where she worked as an ingredient handler. The severe injuries rendered Ms. Mockbee a paraplegic. There was no guardrail at this floor opening of the manlift. At the time of Ms. Mockbee's accident, the Danville plant had three manlifts. The manlift in

question was manufactured by Viola Elevator Company and installed at the Danville plant in the late 1960s or early 1970s, which the plaintiffs have designated as the "southwest" manlift, a designation we follow.

¶ 4      A manlift is a vertical conveyor belt used to move personnel from floor to floor. A motor drives a continuous belt with step platforms and loop handholds between the floors. The manlift system transports personnel in either direction, to higher or lower floors. At the originating base of the manlift is an elevated platform from which an individual can either mount the manlift to be transported to a higher floor (the upside) or dismount the manlift from a higher floor (the downside). Use of the manlift was optional for all Quaker Oats employees; stairs between the floors of the plant were nearby. Manlifts in Illinois are regulated by OSHA (29 U.S.C. § 651 (2006)).

¶ 5      Since its installation, Quaker Oats changed the configuration of the southwest manlift at least twice. When first installed, the southwest manlift ran from the first to the sixth floor. Sometime before 1977, Quaker Oats shortened the manlift to run only between the third and sixth floors of the plant. At the beginning of 1991, Quaker Oats took steps to return the southwest manlift to its original run length, beginning on the first floor. Quaker Oats requested a quote from Humphrey for the parts and materials necessary to accomplish this reconfiguration. Quaker Oats also requested that Humphrey determine whether the southwest manlift system required any repairs or maintenance.

¶ 6      On February 14, 1991, Humphrey employee John Favro conducted a visual inspection of the southwest manlift as it operated at the time between the third and sixth floors. Favro documented on a data sheet his measurements and observations of the manlift. He noted that the mounting platform on the third floor had a height of 36 inches. He observed the presence of guardrails on the upside of the southwest manlift at the bottom area; he also noted that the "bottom area guarded" was "o.k."

¶ 7      On February 26, 1991, Favro sent Quaker Oats a report listing the results of his inspection.

> "This report will be furnished in two (2) parts. The first part will point out what is required for your manlifts to comply with the current ANSI/ASME A 90.1–1985 Safety Standard for Belt Manlifts. The second part will cover repairs, adjustments, etc., we recommend."

At the close of his report, Favro listed the parts and material, with corresponding prices, Quaker Oats would need to extend the southwest manlift to the first floor of the plant. In his deposition, Favro testified that Quaker Oats never responded to his report of February 26, 1991, because Quaker Oats was aware that Humphrey did not perform maintenance or repair work on manlifts. Favro could not say whether any of the guardrails he identified in his report as present at the time of his inspection were located where the plaintiffs claimed the OSHA-required guardrail should have been placed. According to Favro, his inspection of the southwest manlift on February 14, 1991, was Humphrey's last contact with Quaker Oats regarding the southwest manlift before Ms. Mockbee's accident.

¶ 8      In late 1991 or early 1992, Quaker Oats used its own employees to extend the southwest manlift to the first floor from the third floor. The modification included moving the mounting

platform to the first floor. According to Quaker Oats employee Keith Schwartzkopf, the upside guardrail was not present when he moved the mounting platform to the first floor at the end of 1991. According to Schwartzkopf, the guardrails depicted in the photographs taken shortly after Ms. Mockbee's accident were not the same as those he moved from the third floor. According to the record evidence, the legs on the platform were changed from round pipe to square tubing after the extension of the southwest manlift to the first floor. Through 2002, Quaker Oats employees performed weekly and monthly inspections of the southwest manlift after it was extended to the first floor.

¶ 9 At the time of Ms. Mockbee's accident in 2002, the southwest manlift provided access to six floors of the plant, with the platform system located only on the first floor. The manlift system necessarily involved two floor openings, one for the upside, the other for the downside. The layout of the manlift platform system on the first floor required an individual that dismounted the manlift to walk past the upside floor opening to reach the descending stairs, which led to the door to exit the manlift system room. The elevated platform walkway to the descending stairs was 36 inches wide.

¶ 10 The first-floor platform of the southwest manlift had three of its four sides of the downside opening blocked. The descending manlift belt blocked one side, a wall blocked another, and a guardrail blocked the third side. The remaining side was where personnel dismounted the manlift. By contrast, the floor opening for the upside of the southwest manlift had only two of its sides blocked. The ascending manlift belt blocked one side and a wall blocked the other. One open side permitted personnel to mount the manlift; the other open side abutted the platform walkway, which led to the descending stairs. Ms. Mockbee fell into this unguarded opening of the upside of the southwest manlift.

¶ 11 The plaintiffs assert no purpose was served by leaving this side opening unguarded. In fact, the policy at Quaker Oats directed personnel to mount the ascending manlifts only from a position facing the belt; it did not allow side mounts. OSHA regulations also required this side opening to have a guardrail. The platform system of the southwest manlift on the first floor is the only upside opening without a guardrail adjacent to where the manlift is mounted. The plaintiffs contend the unguarded opening exposed those dismounting to the risk of falling into the upside floor opening, a risk that OSHA required be addressed by a guardrail.

¶ 12 Beginning in 1998 through May 2002, Quaker Oats hired Harris to inspect, maintain, and repair the manlift platform systems at the Danville plant. Harris was paid approximately $40,000 for its services under an oral agreement. Harris performed no less than an annual inspection on the manlifts. In the six months before the accident, Harris, through its employees, inspected the southwest manlift, or performed work on it, on at least two occasions.

¶ 13 In his deposition, Scott Harris, the owner and manager of Harris Industries, stated Quaker Oats requested that Harris perform an annual inspection and a weight test of the manlifts at the Danville plant. In addition to periodic inspections, Harris also performed service calls. Harris acknowledged that the services it provided included safety advice and recommendations to Quaker Oats regarding the manlift. Harris had no authority to perform safety work, unless expressly directed to do so by Quaker Oats. All of the inspection reports

Harris generated referenced American Society of Mechanical Engineers (ASME) standards, specifically ASME A 90.1–1985. Harris claims it never made any representations that it would inspect the manlifts for OSHA compliance.

¶ 14　The five inspection reports Harris issued from March 23, 1998, to April 18, 2002, noted two deficiencies: "(1) the platform could be guarded to prevent entry to pit; and, (2) there is no reset at the bottom landing." Harris claims Quaker Oats did not address these deficiencies nor did it ever direct Harris to correct them. Harris acknowledged it never recommended a guardrail be installed on the side opening of the first-floor platform of the southwest manlift involved in Ms. Mockbee's accident because it was Harris's opinion that ASME A 90.1–1985 did not require a guardrail to protect the opening.

¶ 15　In addition to Harris, Quaker Oats hired various other contractors to perform safety surveys of the manlift. One such contractor was Industrial Erectors, which performed safety surveys on the southwest manlift on January 13, 1994, October 9, 1995, and March 12, 1997. In its report regarding its safety survey of March 12, 1997, Industrial Erectors noted "hand railing should be added next to openings on each side of manlift by platform."

¶ 16　Ms. Mockbee provided the following testimony at her deposition regarding the accident. She took the southwest manlift down from the third floor to the first floor, where the cafeteria was located, at the start of her 30-minute meal break. Ms. Mockbee dismounted the downside of the manlift and began to walk on the platform in the direction of the descending stairs to exit the manlift room. As she walked past the upside floor opening on the 36-inch-wide platform, her right foot stepped off the walkway and fell into the unguarded opening. Ms. Mockbee was well aware that this side of the upside opening of the manlift did not have a guardrail. She described the opening to mount the lift, which faces the belt, as the "front." She was also aware that the unguarded side was never to be used to mount the manlift. She testified she fell into the side of the upside floor opening and was injured when the ascending step-platform of the manlift pinned her against the platform structure, crushing her midsection. Ms. Mockbee did not know what caused her to miss the platform walkway and step into the unguarded opening. She testified she did not intentionally fall into the opening, nor did she trip; she was not in a hurry. She believes she was not distracted at the time her right foot fell into the opening; nor was her view of the opening blocked in any way. At the time of her fall, Ms. Mockbee was looking straight ahead in the direction of the platform stairs and manlift-room door. Ms. Mockbee could not say whether she fell forward, sideways, or backward into the unguarded opening. Ms. Mockbee has very little memory of what occurred after she stepped into the unguarded opening. Ms. Mockbee had used the manlifts on a fairly regular basis since the start of her employment with Quaker Oats in 2000, and felt that the southwest manlift was safe. She acknowledged that Quaker Oats had provided training on the proper method to mount and dismount the manlift and on the safe use of the platform walkway. She was well aware that employees' use of the manlift was optional.

¶ 17　Following the incident, Quaker Oats received an OSHA violation for not having a guardrail on the southwest manlift platform side opening. Two OSHA sections address safety requirements for manlifts. Section 68(b)(9)(i) provides:

> "The floor opening at each landing shall be guarded on sides not used for entrance or exit

by a wall, a railing and toeboard or by panels of wire mesh of suitable strength." 29 C.F.R. § 1910.68(b)(9)(i) (2010).

Section 68(b)(10)(iv) provides:

"To guard against persons walking under a descending step, the area on the downside of the manlift shall be guarded in accordance with subparagraph (8) of this paragraph. To guard against a person getting between the mounting platform and an ascending step, the area between the belt and platform shall be protected by a guardrail." 29 C.F.R. § 1910.68(b)(10)(iv) (2010).

Quaker Oats paid the fine and modified the southwest manlift to comply with OSHA by installing a guardrail at the side opening.

¶ 18    Roger Smith, manager of Quaker Oats's health, safety and the environment division at the time of the accident, was designated as Quaker Oats's representative deponent under Illinois Supreme Court Rule 206(a)(1) (eff. Dec. 1, 1999), as the individual most knowledgeable about the manlift inspections and ASME A 90.1–1985 compliance, as well as the physical characteristics of the southwest manlift. He acknowledged that he was responsible for the inspection, maintenance, and repairs of the manlift platform system. He contended that Quaker Oats expected that both Humphrey and Harris would inspect the manlift platform system to ensure it was safe and complied with OSHA and ASME. According to Smith, Quaker Oats relied on the inspections by Harris and Humphrey for that purpose.

¶ 19    John Pravdica, the maintenance manager at Quaker Oats at the time of the accident, testified at his deposition that it was Quaker Oats's expectation that Harris would inspect the manlift platform system to ensure its safety and its compliance with OSHA and ASME. Pravdica conceded that before an outside company could perform any work at the Danville plant, Quaker Oats would have to first approve and authorize that work. Pravdica testified that he, Dan Bantz, and John Foreman would rely on the recommendations and advice of Harris to determine the work Quaker Oats would authorize. Pravdica supervised Bantz and Foreman.

¶ 20    Foreman was a manlift mechanic at the time of the accident and served as Harris's contact at Quaker Oats. He confirmed that he performed weekly and monthly inspections of the manlift system at the Danville plant between 1993 and 2003. He was of the opinion that neither OSHA nor ASME required additional guardrails on the southwest manlift. Nevertheless, he opined that it was Harris's job to inform Quaker Oats should the manlifts be defective. His expectation was that Harris's inspections of the manlift platform system would assure the system's compliance with OSHA and ASME. He contended Quaker Oats relied on Harris's inspections, supplemented by its own inspections.

¶ 21    The plaintiffs offered the opinions of three experts: John Costa, Frank Burg, and John Frauenhoffer. All three experts opined that the southwest manlift platform system was deficient in three ways: (1) it lacked a guardrail on the side opening of the upside at the system platform on the first floor; (2) the absence of that guardrail violated OSHA and rendered the system unsafe; and (3) the system should have been shut down until the guardrail was installed. Costa, Burg, and Frauenhoffer all opined that within the industry, a

safety inspection on a manlift would be done pursuant to OSHA and other applicable standards. According to each, a reasonably careful inspection company would have inspected the southwest manlift to ensure its compliance with OSHA. Costa and Burg asserted that a safety inspection would also ensure compliance with ASME. All three experts concluded that Humphrey and Harris were negligent in failing to inform Quaker Oats that the absence of a guardrail on the side of the upside opening of the southwest manlift platform system violated OSHA. Costa and Burg also opined that Harris was negligent in failing to inform Quaker Oats that the southwest manlift, as it existed in 2002 without a guardrail on the side opening, violated two provisions of ASME. ASME 4.5.2 provides:

> "On those sides not used as a landing, the guardrails shall be extended to a minimum height of 66 in. *** This minimum 66 in. *** high guardrail is intended to prevent people alongside the manlift from being able to lean over the guardrails and into the floor opening ***."

ASME 4.6.4 provides:

> "To guard against persons walking under a descending step, the area on the down-side of the manlift shall be guarded in accordance with para. 4.5 [and] [t]o guard against a person getting between the mounting platform and ascending step, the area on the up-side of the manlift shall be guarded in accordance with para. 4.5 as well."

¶ 22    Harris claimed that its inspection of the southwest manlift platform system confirmed the system was in compliance with ASME, which it believed to be more stringent than OSHA.

¶ 23                                    Procedural History

¶ 24    In their fourth amended complaint, the plaintiffs alleged the OSHA violation supported claims of negligence against Harris and Humphrey and that the unguarded opening of the southwest manlift platform system was a proximate cause of the injuries sustained by Ms. Mockbee. The safety guardrail on the side of the upside opening of the southwest manlift platform system would have prevented Ms. Mockbee's fall and resulting injuries. The plaintiffs contended Harris and Humphrey were negligent in failing to inform Quaker Oats of the need for a guardrail to comply with OSHA, which caused or contributed to Ms. Mockbee's injuries.

¶ 25    The circuit court denied Harris's *forum non conveniens* motion to transfer venue from Cook County to Vermilion County, where Danville is located.

¶ 26    On November 19, 2008, Humphrey filed a motion for summary judgment, arguing the plaintiffs' claims were time barred by section 13-214 of the Illinois Code of Civil Procedure (735 ILCS 5/13-214(b) (West 2010)), sometimes referred to as the "construction statute of repose," and that it owed Ms. Mockbee no legal duty of care. On April 7, 2009, following a hearing on the motion in February, the circuit court granted Humphrey's motion based on the absence of any legal duty of care on the part of Humphrey under the plaintiffs' negligence theory. The court found "nothing in the record to support Mockbee's assertion that Humphrey had a duty to inspect the manlift for OSHA compliance, nor is there any reference to the record that Humphrey failed to perform its ANSI/ASME inspection competently." The court found the affidavit of the plaintiffs' expert, Costa, insufficient to support the plaintiffs'

claim that the floor opening violated ASME. The court rejected the plaintiffs' contention that Humphrey engaged in a voluntary undertaking regarding OSHA compliance. The court noted that the only evidence on the configuration of the southwest manlift platform system at the time of Humphrey's inspection was Favro's documented data sheet and deposition testimony detailing his visual inspection of the manlift on February 14, 1991, which indicated guardrails were in place at the upside and downside floor openings when the platform system was located on the third floor. The court determined the case law cited by the plaintiffs, *Ryan v. Commonwealth Edison Co.*, 381 Ill. App. 3d 877 (2008), and *MBA Enterprises, Inc. v. Northern Illinois Gas Co.*, 307 Ill. App. 3d 285 (1999), inapposite on the issue of duty in the instant case "because both cases involved defendants who had a continuing duty to maintain." For much the same reason that no duty of care existed from Humphrey to Ms. Mockbee, the court rejected Humphrey's claim of protection under the statute of repose because Humphrey provided only standard products, which Quaker Oats used to extend the southwest manlift to the first floor. The circuit court denied the plaintiffs' motion to reconsider its order granting summary judgment to Humphrey.

¶ 27    On April 21, 2009, Harris filed its motion for summary judgment, asserting three grounds for judgment in its favor: (1) as a safety service organization, it was immune from liability under section 5(a) of the Compensation Act; (2) it owed Ms. Mockbee no duty of care because the dangerous condition was open and obvious and because the OSHA sections governing manlifts did not give rise to a duty of care on the part of Harris; and (3) its acts or omissions were not a proximate cause of Ms. Mockbee's injuries. Following an August hearing, the circuit court granted Harris's motion on November 13, 2009, finding Harris owed "no duty to Mockbee to cause Quaker Oats to install guardrails at the opening through which Mockbee fell because the risk of falling into the unguarded opening was open and obvious." The court rejected the plaintiffs' claim that an exception to the open and obvious doctrine applied. The court ruled that even if Harris owed Ms. Mockbee a duty of care, Harris was entitled to summary judgment as a matter of law on the issue of proximate cause because no evidence of the cause of Ms. Mockbee's fall was adduced. "Without such evidence, the finder of fact would have to engage in speculation in order to conclude that her injuries were proximately caused by the breach of duty by Harris, or any other parties sued in this matter for that matter." The court declined to reach Harris's claim that it was entitled to immunity under the Compensation Act.

¶ 28    The plaintiffs timely appeal the grants of summary judgment to Humphrey and Harris. In its cross-appeal, Harris contends the circuit court erred in denying its *forum non conveniens* motion to transfer this case to Vermilion County; Harris also asserts it qualifies as a service organization under the Compensation Act, which provides a separate basis to affirm the circuit court's grant of summary judgment. Humphrey joins in this latter argument.


¶ 29                                    ANALYSIS

¶ 30    The circuit court granted summary judgment to each of the defendants based, in part, on a lack of duty owed to the plaintiffs arising from their safety inspections. The court declined to reach Harris's motion for dismissal based on its claim of immunity as a "service

organization" under section 5(a) of the Compensation Act, which Harris raises in its cross-appeal. Humphrey joins in Harris's contention that statutory immunity applies, though Humphrey concedes it did not raise this claim before the circuit court. "[U]nder Mockbee's proposition, Humphrey would be entitled to immunity as a 'service organization' under Section 5(a) of the Workers' Compensation Act." While the plaintiffs challenge that each defendant qualifies for immunity under section 5(a), the plaintiffs do not assert that the statutory immunity claim is not properly before this court. See *Murphy v. Rochford*, 55 Ill. App. 3d 695, 701 (1977) ("a reviewing court is not limited or confined to the precise reasons given by the trial court in entering summary judgment"). Because of the dispositive nature of this claim, we address first Harris's cross-appeal that section 5(a) of the Compensation Act defeats the plaintiffs' common law right to seek recovery.

¶ 31    Harris asserts section 5(a) precludes the plaintiffs from recovering damages because three statutory conditions exist: (1) it is a service organization (2) retained by the employer (3) to provide safety service, advice, or give recommendations to Quaker Oats. While both defendants now assert this immunity under section 5(a) of the Compensation Act and the plaintiffs offer no distinction between the two, our discussion that follows names only "Harris" for simplicity's sake.

¶ 32    As Harris asserts, the plaintiffs' only dispute is with Harris's claim that it is "a 'service organization' within the meaning of the [Compensation] Act." The plaintiffs contend, "Section 5(a)'s construction requires particular showings in order to gain immunity, and Harris clearly has not met this burden." According to the plaintiffs, "Harris' claim that it is a service organization is nothing more than a naked allegation unsupported by the evidence or the law." At the same time, the plaintiffs acknowledge that the plain language of the statute does not define a "service organization." They contend, however, that "the statute does not grant immunity to all parties retained to provide safety service, advice or recommendations." The plaintiffs contend Harris is merely "one of the excluded entities that simply provide safety service, advice or recommendations." To include Harris as a "service organization" entitled to statutory immunity under section 5(a) would extend "the language of the Act beyond its plain meaning and take away [Ms. Mockbee's] common-law right to seek recovery from *** third parties." The plaintiffs point to the absence of "pertinent authority" offered by Harris.

¶ 33    As support for their position that Harris does not fall within the ambit of section 5(a), the plaintiffs contend that the reach of the term "service organization" within the meaning of the Compensation Act is limited. The plaintiffs offer that only a service organization "that was in the position to provide safety inspections as part of a larger relationship with an employer within the ambit of worker's compensation *** [is] covered by the immunity under section 5(a)." The plaintiffs would exclude organizations like Harris that provide safety inspections because "in addition [they] perform maintenance and repair." Further, the plaintiffs argue that Harris "has never made any payments toward Mockbee's workers' compensation benefits nor did it have any relationship with the provider." As the plaintiffs explain in their brief, "Allowing a party who has paid nothing toward an injured employee's workers' compensation benefits to nevertheless invoke the [Compensation] Act's immunity to escape tort liability would be tantamount to allowing the party 'to have its cake and eat it too.' " The

plaintiffs broadly assert that only those organizations that have this nexus with "the employer-employee relationship" are eligible for the Compensation Act's exclusive remedy provisions. Finally, the plaintiffs contend that the third parties intended to be covered by the legislature under section 5(a) are those "parties that conduct *gratuitous* safety inspections as incident to their workers' compensation relationship with the employer." (Emphasis in original.) In support of their contention that more than the mere provision of a safety inspection is required to invoke immunity under section 5(a), the plaintiffs point to cases where "Illinois courts have imposed liability on entities that contract to provide service inspection, and/or maintenance." To support their position, the plaintiffs cite five cases: *Davlan v. Otis Elevator Co.*, 816 F.2d 287 (7th Cir. 1987); *Sikora v. AFD Industries, Inc.*, 319 F. Supp. 2d 872 (N.D. Ill. 2004); *Jardine v. Rubloff*, 73 Ill. 2d 31 (1978); *Leavitt v. Farwell Tower Ltd. Partnership*, 252 Ill. App. 3d 260 (1993); and *Stines v. Otis Elevator Co.*, 104 Ill. App. 3d 608 (1982).

¶ 34                          Section 5(a) of the Compensation Act

¶ 35      Questions of statutory interpretation are reviewed *de novo*. *Taylor v. Pekin Insurance Co.*, 231 Ill. 2d 390, 395 (2008). Our primary goal is to ascertain the true intent of the legislature as expressed by the language of the statute. *Id.* When statutory language is plain and unambiguous, we apply its meaning without looking to outside sources of interpretation. *Id.* "[O]nly where the statutory language is unclear may a court look beyond it." *Denton v. Civil Service Comm'n*, 176 Ill. 2d 144, 149 (1997). "This court has no power to restrict the plain meaning of an unambiguous statute." *Mier v. Staley*, 28 Ill. App. 3d 373, 384 (1975).

¶ 36      The Compensation Act "is designed to provide financial protection to workers for accidental injuries arising out of and in the course of employment." *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 462 (1990). In exchange for this financial protection paid for by employers, the Compensation Act "prohibits common law suits by employees against the employer. The exclusive remedy provision is part of the *quid pro quo* in which the sacrifices and gains of employees and employers are to some extent put in balance, for, while the employer assumes a new liability without fault, he is relieved of the prospect of large damage verdicts." (Internal quotation marks omitted.) *Id.* When *Meerbrey* was decided, section 5(a) of the Compensation Act provided more limited immunity: " 'No common law *** right to recover damages from the employer *** or the agents or employees of *** [the employer].' " *Id.* at 462 (quoting Ill. Rev. Stat. 1987, ch. 48, ¶ 138.5(a)).

¶ 37      Section 5(a) of the Compensation Act was amended in 1969. Section 5(a) now provides:

"No common law or statutory right to recover damages from the employer, his insurer, his broker, *any service organization* retained by the employer, his insurer or his broker to provide safety service, advice or recommendations for the employer or the agents or employees of any of them for any injury or death sustained by any employee while engaged in the line of his duty as such employee ***." (Emphasis added.) 820 ILCS 305/5(a) (West 2010).

¶ 38      There can be no dispute that the legislature added "insurer," "broker," "service organization," and "agents or employees of any of them," to expand the class of personnel

-10-

and entities entitled to immunity. The expansion was a legislative response to *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 71-72 (1964), in which our supreme court interpreted the Florida workers' compensation act to permit a common law action against an insurer of the employer for "negligent performance of gratuitous safety inspections and safety engineering service." Justice House, in a short dissent in *Nelson*, observed: "Under the stringent rule adopted by the majority no insurer will hereafter dare offer to perform, or perform, limited inspection services for fear of incurring liability. Undoubtedly such services, though limited, have contributed to the safety of workers and prevented economic loss. Sound policy would seem to dictate that the kind of service rendered by this insurer should be encouraged rather than discouraged." *Id*. at 121 (House, J., dissenting). The *Nelson* court did not address whether the Illinois Compensation Act would warrant an interpretation similar to that of the Florida workers' compensation act. But see *Towns v. Kessler*, 10 Ill. App. 3d 356, 360 (1973) (observing that the *Nelson* decision was "very persuasive authority for the point that Illinois would recognize a common law liability against a negligent insurer providing safety services"). However, in 1974 the supreme court addressed squarely the question left unanswered in *Nelson* regarding the Illinois Compensation Act. In *Reid v. Employers Mutual Liability Insurance Co.*, 59 Ill. 2d 194 (1974), an employee filed suit against his "employer's workmen's compensation insurance carrier for alleged negligence on the part of the insurance company in performing safety inspections of the printing press on which he was injured during the course of his employment." *Id.* "The gist of plaintiff's complaint was that in conducting safety inspections of the plant defendant knew or should have known of the lack of adequate safety mechanisms on the press and that it carelessly and negligently failed to detect and report the dangerous conditions to the employer." *Id.* at 196. The court set out the question before it: "The issue presented for our determination is whether the foregoing provisions contemplate that an employer's workmen's compensation carrier should be amenable to suit as a third-party tortfeasor for alleged negligence in performing the type of safety inspections which occurred here." *Id*. at 197. The accident predated the amendment to section 5(a), otherwise the suit against the workmen's compensation carrier would have been barred under the 1969 amendment to section 5(a) of the Compensation Act. "At the outset, we note that this question will not arise in cases governed by a 1969 amendment to section 5(a) ***." *Id.* The supreme court noted "that a workmen's compensation insurer is not included within the definition of the term 'employer' appearing in section 1(a) of the Act [citation] nor is the insurer expressly mentioned in section[ ] 5(a) ***. However, this does not necessarily mean that *** an employee should have a common-law right of action against the insurer for the type of safety inspections which occurred here." *Id.* at 199. Ultimately, the supreme court ruled the plaintiff's cause of action was statutorily barred. "[W]e construe section 5(a) of the Act in effect at the time of the plaintiff's injury as precluding an action by an employee against his employer's compensation insurer for the type of safety inspections conducted by defendant in this case." *Id.* at 200.

¶ 39     Four years after the amendment and consistent with Justice House's dissent in *Nelson* and the full court's decision in *Reid*, this court noted the clear legislative purpose behind the 1969 amendment to section 5(a). "The apparent purpose of the amendment is to promote industrial

safety inspections." *Mier*, 28 Ill. App. 3d at 384 (citing *Towns*, 10 Ill. App. 3d 356). *Mier* offers facts similar to the instant case.

¶ 40    In *Mier*, the plaintiff was injured at the defendant's factory when she fell off a manlift. *Id.* at 376. She sued Self-Insurers Service, Inc. (S.I.S.), alleging that S.I.S. negligently performed safety inspections, which proximately led to her injuries. *Id.* The plaintiff's complaint alleged "that S.I.S. is a safety service organization retained by the employer." *Id.* at 382. The circuit court dismissed the suit against S.I.S., holding the action was barred by section 5(a) of the Compensation Act. *Id.* at 384. In support, the court noted the obvious: as a safety service organization retained by the employer, "the statute clearly grants [S.I.S.] immunity from common-law suit." *Id.* at 382. On appeal, the plaintiff's challenge was to the constitutionality of the immunity extension. *Id.* She asserted the 1969 amendment was "arbitrary and unreasonable" in extending immunity to anyone other than the employer, employees, and the workers' compensation carrier. *Id.* The plaintiff contended no distinction should be made between safety organizations hired by the employer and those retained by third parties. *Id.* at 383. In upholding the constitutionality of section 5(a) of the Compensation Act, granting to the safety organization the same immunity employers enjoy, the *Mier* court noted, "The legislature has chosen to encourage the use of experts by granting to the safety organization the same immunity the employer has and there is a characteristic distinguishing Self-Insurers Service, Inc., from safety organizations employed by others. A grant of immunity to those safety services would extend to them an immunity their employer does not possess. We find that this is a distinction upon which it is rational to make classifications." *Id.*

¶ 41    Harris argues that it, like S.I.S. in *Mier*, qualifies as a service organization entitled to immunity under section 5(a) of the Compensation Act because of the services it was retained to provide. As support for its position, Harris points out that it was retained by Quaker Oats to perform safety inspections aimed at addressing worker safety. Harris notes it was not under contract with Quaker Oats to perform continuing maintenance on the southwest manlift. Harris was hired by Quaker Oats on a per-job basis and had no authority to perform repairs or maintenance without the express authorization of Quaker Oats. Harris argues that because Ms. Mockbee's claim is for negligence in Harris's performance of safety inspections in which Harris failed to note the need for an additional guardrail at the platform level of the southwest manlift, Harris clearly falls within the unambiguous language of section 5(a) of the Compensation Act and the legislative intent behind the immunity granted to service organizations hired by the employer to perform safety inspections. Harris argues it is therefore entitled to immunity from the plaintiffs' common law claims.

¶ 42    The plaintiffs concede that Harris was contracted by Quaker Oats "to perform inspection, repair and maintenance work" on the southwest manlift. The plaintiffs correctly acknowledge that "Harris is an inspection and maintenance company." Nonetheless, the plaintiffs assert not every organization that provides "safety service, advice or recommendations" qualifies as a "service organization" under section 5(a). In effect, the plaintiffs argue that a "service organization" entitled to the expanded immunity under section 5(a) is limited to organizations that are related to the insurance industry, in particular, "Quaker's workers' compensation [carrier]." To emphasize this point, the plaintiffs argue, "A party must

-12-

contribute to providing workers' compensation benefits to receive the benefit of the Act's immunity." To demonstrate Harris's lack of relation to the insurance industry, the plaintiffs assert: "Harris has never made any payments toward Mockbee's workers' compensation benefits nor did it have any relationship with the provider. It provided no services in respect to workers' compensation, and thus, by the terms of the bargain, Harris should not be able to escape tort liability."

¶ 43    The limitations urged by the plaintiffs on the scope of section 5(a) are not unlike the limitations written into workers' compensation acts of other states. See Fla. Stat. Ann. § 440.11(3) (West 2004) ("An employer's *** safety consultant shall not be liable as a third-party tortfeasor to employees of the employer *** in carrying out the employer's rights and responsibilities *** by furnishing any *** safety service incidental to the workers' compensation or employers' liability coverage ***."); Ala. Code § 25-5-53 (2004) ("[I]mmunity from civil liability for all causes of action except those based upon willful conduct shall also extend to the workers' compensation insurance carrier of the employer ***. For the purpose of this section, a carrier *** shall include a company or a governmental agency making a safety inspection on behalf of a self-insured employer ***."); Mich. Comp. Laws Ann. § 418.131(2) (West 2004) (" '[E]mployer' includes the employer's insurer and a service agent to a self-insured employer insofar as they furnish, or fail to furnish, safety inspections *** incident to providing worker's compensation insurance or incident to a self-insured employer's liability servicing contract."). *Cf.* Conn. Gen. Stat. § 31-293 (upholding common law actions against third parties: "When any injury for which compensation is payable under the provisions of this chapter has been sustained under circumstances creating in a person other than an employer *** a legal liability to pay damages for the injury, *** the payment of compensation shall not affect the claim or right of action of the injured employee against such person, but the injured employee may proceed at law against such person to recover damages for the injury."). Thus, if the set of service organizations granted immunity by section 5(a) were as narrow as the plaintiffs urge before us, the Illinois legislature would have used language consonant with the limitations employed by the legislatures of Florida, Alabama, and Michigan. The Illinois legislature could also have expressly preserved an employee's right to file a common law action against a third-party service organization as the Connecticut legislature did. The Illinois legislature did neither.

¶ 44    The Illinois legislature clearly intended to extend the immunity granted to an employer under the Compensation Act beyond the insurer of the employer for a common law action for the "negligent performance of gratuitous safety inspections and safety engineering service," as our supreme court concluded the Florida workers' compensation act permitted an employee to file (*Nelson*, 31 Ill. 2d at 71-72), when in 1969 the Illinois legislature amended section 5(a). In fact, the supreme court's decision in *Reid* upheld immunity to the employer's compensation carrier before the effective date of the 1969 amendment to section 5(a). *Reid*, 59 Ill. 2d at 200 ("we construe section 5(a) of the Act in effect at the time of the plaintiff's injury as precluding an action by an employee against his employer's compensation insurer for the type of safety inspections conducted by defendant in this case"). In *Reid*, the supreme court also made clear that certain common law actions by employees against third parties would be barred by the 1969 amendment to section 5(a). *Reid*, 59 Ill. 2d

-13-

at 197 ("At the outset, we note that this question will not arise in cases governed by a 1969 amendment to section 5(a) ***."). The legislature in the 1969 amendment to section 5(a) extended immunity to "*any service organization* retained by the employer *** to provide safety service, advice or recommendations for the employer." (Emphasis added.) 820 ILCS 305/5(a) (West 2010).

¶ 45    The plaintiffs' only argument that the plain meaning of section 5(a) does not apply to Harris is their claim that Harris is not a "service organization." What the plaintiffs fail to address, however, is why the term "service organization" should not be given its plain meaning, within the context of section 5(a), when the legislature did not define the term in the Compensation Act. See *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 16 (2009) ("Undefined statutory terms must be given their ordinary and popularly understood meanings."). Under the plain meaning of section 5(a), a qualifying service organization is any organization that provides "safety service, advice or recommendations for the employer." 820 ILCS 305/5(a) (West 2010). The plaintiffs' arguments that Harris should be not covered by section 5(a) because it did not contribute to the workers' compensation coverage for Ms. Mockbee, or it is not sufficiently tied to the employer-employee relationship, or, in addition to safety inspections, it "performed maintenance and repair," or it was compensated for the services it provided, all miss the mark. If the legislature meant to restrict the application of "service organization" as the plaintiffs urge before us, it could have expressly imposed any or all of those restrictions in its amendment to section 5(a) as the legislatures of Florida, Alabama, and Michigan appear to have done. The plaintiffs' position is supported by nothing more than policy arguments against giving the term "service organization" its plain meaning of an organization that provides a safety inspection service to an employer. It is not the role of this court to superimpose policy-based restrictions on the scope of section 5(a), given its plain and unambiguous language. "This court has no power to restrict the plain meaning of an unambiguous statute." *Mier*, 28 Ill. App. 3d at 384. Only the legislature may restrict the scope of the immunity granted by section 5(a).

¶ 46    The necessary showing to qualify a service organization for statutory immunity under section 5(a), the organization must "provide safety service, advice or recommendations for the employer." 820 ILCS 305/5(a) (West 2010). The plaintiffs do not dispute that Harris and Humphrey provided safety service, advice, and recommendations to Quaker Oats. In fact, Ms. Mockbee's theory of recovery against Harris and Humphrey is that each was negligent in providing the qualifying service, advice, and recommendations.

¶ 47    We find no room for ambiguity in section 5(a) of the Compensation Act to permit Ms. Mockbee's common law right of action against either defendant. Unlike the supreme court in *Reid*, where it construed the term "employer" in section 5(a) of the Compensation Act to include an employer's compensation insurer (*Reid*, 59 Ill. 2d at 200), there is no need to construe the unambiguous language added to section 5(a) in 1969; its language is plain enough. Nor do the cases cited by the plaintiffs, in support of their position that liability should apply to Harris as expressed by their contention that "Illinois courts have imposed liability on entities that contract to provide service inspection, and/or maintenance," offer any guidance to a conclusion contrary to that which we reach. The five cases cited–*Davlan*, 816 F.2d 287; *Sikora*, 319 F. Supp. 2d 872; *Jardine*, 73 Ill. 2d 31; *Leavitt*, 252 Ill. App. 3d 260;

-14-

and *Stines*, 104 Ill. App. 3d 608–are inapposite as none involves section 5(a) of the Compensation Act.

¶ 48 We find no basis to exclude Harris from the plain and simple meaning of "service organization," as the plaintiffs urge. Both Harris and Humphrey plainly qualify as service organizations under section 5(a). It necessarily follows that Ms. Mockbee has no common law right to recover damages from either Harris or Humphrey for the injuries she sustained as an employee of Quaker Oats. 820 ILCS 305/5(a) (West 2010). We affirm the circuit court's grant of summary judgment to Harris and Humphrey.

¶ 49                        Motion to Transfer Venue

¶ 50 We do not review the circuit court's ruling on Harris's *forum non conveniens* motion as Harris asks that we reach that issue only if we reverse the circuit court's grant of summary judgment in its favor.

¶ 51                              CONCLUSION

¶ 52 The circuit court properly granted summary judgment to Harris and Humphrey. As a matter of statutory interpretation, Harris and Humphrey are service organizations retained by Quaker Oats, Ms. Mockbee's employer, to perform safety inspections and as such are immune from liability for common law causes of action by a Quaker Oats employee under section 5(a) of the Compensation Act.

¶ 53 Affirmed.