# Illinois Official Reports

## Appellate Court

---

### *Greenhill v. REIT Management & Research LLC*, 2019 IL App (1st) 181164

---

| | |
|---|---|
| Appellate Court Caption | ROBERT GREENHILL, Plaintiff-Appellant, v. REIT MANAGEMENT & RESEARCH LLC; CW 600 WEST CHICAGO, LLC; and THYSSENKRUPP ELEVATOR CORPORATION, Defendants-Appellees, and THYSSENKRUPP ELEVATOR CORPORATION, Third-Party Plaintiff and Cross-Appellant, v. POWER CONSTRUCTION COMPANY, LLC, and SMS LIQUIDATING, INC., f/k/a SUPERIOR MECHANICAL SYSTEMS, INC., Third-Party Defendants and Cross-Appellees. |
| District & No. | First District, Fourth Division<br>No. 1-18-1164 |
| Filed | December 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2014-L-8541; the Hon. Allen Price Walker, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Dennis M. Lynch and Patrick C. Anderson, of Healy Scanlon, of Chicago, for appellant.<br><br>Steven A. Hart, Brian H. Eldridge, and Carter Grant, of Hart McLaughlin & Eldridge, LLC, of Chicago, for appellees REIT Management & Research, LLC, and CW 600 West Chicago, LLC. |

Steven P. Rouse and Brittany L. McElmury, of Molzahn, Reed, & Rouse, LLC, of Chicago, for cross-appellant ThyssenKrupp Elevator Corporation.

Anthony J. Ritrovato, of Maisel & Associates, of Naperville, for cross-appellee Superior Mechanical Systems, Inc.

Panel        JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1      As plaintiff Robert Greenhill entered a freight elevator while working as a sprinkler fitter at a construction project, another passenger pressed the "door close" button, causing the elevator gate to descend and strike Greenhill. Greenhill filed an action in the circuit court of Cook County against the building's owner, CW 600 West Chicago, LLC, and the building's manager, REIT Management & Research LLC (together, REIT), as well as the elevator maintenance company, ThyssenKrupp Elevator Corporation (TKE). Greenhill asserts, in part, that the elevator did not have a functioning audible signal and that the defendants failed to install an electronic sensor in the elevator, which had already been approved, ordered, and delivered. TKE filed a third-party complaint for contribution against (1) Greenhill's employer, Superior Mechanical Systems, Inc., now known as SMS Liquidating, Inc. (Superior), which was a subcontractor on the construction project, and (2) the general contractor, Power Construction Company, LLC (Power). The circuit court ultimately granted summary judgment in favor of REIT and TKE in Greenhill's action and granted summary judgment in favor of Superior and Power in TKE's third-party litigation. Power and Greenhill subsequently reached a settlement, and Power has been dismissed from this appeal.

¶ 2      Greenhill contends on appeal that the circuit court erred in granting summary judgment and in denying his motion to reconsider. In its cross-appeal, TKE alternatively argues that this court should reverse the grant of summary judgment in favor of Superior. For the reasons discussed herein, we (i) reverse the grant of summary judgment in favor of REIT and TKE and (ii) affirm the grant of summary judgment in favor of Superior.

¶ 3                               I. BACKGROUND

¶ 4      REIT owned and managed a building at 600 West Chicago Avenue (the 600 building) in Chicago. The 600 building was part of a complex that spanned four addresses. Three freight elevators (#1, #2, and #3) were in the 600 building; freight elevator #6 was at 900 North Kingsbury. REIT and TKE were parties to a contract whereby TKE agreed to provide maintenance services for elevators and escalators in various properties, including this complex.

¶ 5      Freight elevator #3 had stationary doors at each floor of the building. An elevator gate inside the elevator door traveled up and down with the elevator. The gate was designed and

programmed to close after a preset time period or immediately when the "door close" button was pressed. The gate closed vertically, from top to bottom, and the bottom of the gate had a safety boot, *i.e.*, a rubber pad. If the rubber pad made contact with a person or object, a spring-loaded wire inside triggered the gate to reopen.

¶ 6                                    A. Greenhill's Accident

¶ 7        Power was the general contractor for an office build-out on the fifth floor of the 600 building. Power retained Superior to provide sprinkler fitting services. On September 25, 2012, Superior employees Greenhill and William Toomey arrived at the worksite on the fifth floor to relocate certain sprinkler heads, but they could not find their equipment. Brian Fiorito, Power's assistant superintendent on the job, offered to show Greenhill and Toomey the location of their equipment, which had been moved to the basement. Freight elevator #3 was the only freight elevator that accessed the basement. The three men entered freight elevator #3, but they accidentally exited at the first floor of the building, not the basement.

¶ 8        The men realized their mistake and returned to the elevator. A fourth individual on the elevator held the door open for Fiorito, who entered first. The fourth man was later identified as Robert Plane (Plane), a field service technician who was performing inspections of the generators at the 600 building. Plane later averred that when Fiorito boarded the elevator, Plane looked down toward the elevator's controls to "initiate a close," *i.e.*, press the "door close" button. At that point, Plane did not observe the other two men. Toomey then entered the elevator before Plane pressed the button. As Plane pressed the button, Greenhill was walking onto the elevator. The elevator gate (equipped with the rubber bumper) started to lower, striking Greenhill and knocking his hardhat off his head. The gate then retracted automatically. According to Greenhill, the impact of the lowering gate broke the suspension band inside his hardhat, resulting in a scar on his forehead.

¶ 9        As the freight elevator continued to descend, Greenhill leaned against the elevator wall. When the elevator reached the basement, all four of the men exited. Greenhill worked for a few hours that day but left early due to neck pain. When deposed in 2015, he testified that he had not worked since the date of the accident and was awaiting neck surgery.

¶ 10                                   B. The Initiation of Litigation

¶ 11        Greenhill filed an action in 2014 against REIT and other entities; TKE was subsequently added as a defendant, and other defendants were dismissed. TKE then filed third-party complaints against Superior and Power, asserting that TKE was entitled to contribution from them for any judgment amount in excess of TKE's *pro rata* share of liability. Superior[1] moved for summary judgment, contending (1) it owed no duty relative to the design and maintenance of the elevator, (2) no negligence on Superior's part caused or contributed to Greenhill's accident, and (3) the functioning of the elevator was open and obvious to Greenhill, so no duty was owed to him.

¶ 12        REIT filed counterclaims against TKE, including counts based on contribution and indemnification. According to REIT, TKE violated its duties under their contract by improperly maintaining freight elevator #3 and by failing to procure general liability insurance,

_____

[1]In light of Power's dismissal, we will not discuss the circuit court litigation *vis-à-vis* Power, except where otherwise noted.

- 3 -

which satisfied the contractual requirements.[2] TKE then filed counterclaims for contribution against REIT. TKE alleged, in part, that it had proposed the installation of a new electronic safety edge (discussed below) on freight elevator #3 in March 2012, but REIT did not approve the installation until August 22, 2012. TKE then commenced the installation of the new safety edge in September 2012—after Greenhill's accident—but was not paid by REIT until February 2013.

¶ 13    On December 6, 2017, Greenhill filed his third amended complaint, which is the operative complaint for purposes of this appeal.

¶ 14                    C. The Operative Complaint and Answers

¶ 15    In counts I and II of the operative complaint, Greenhill alleged, in part, that REIT had a duty to exercise the highest degree of care in relation to the freight elevators in the 600 building, which REIT breached by doing one or more of the following: (1) improperly operating, managing, maintaining, or controlling the building so that freight elevator #3 was in an unreasonably dangerous condition; (2) failing to properly inspect the premises; (3) failing to repair the condition of the elevator; (4) failing to have a proper sensor on the elevator; (5) failing to assign a trained elevator operator or to give proper training to those operating the freight elevators; (6) failing to have a proper annunciating device to alert individuals that the door or the inner gate of freight elevator #3 were closing, including a properly functioning audible signal and/or a flashing light; and (7) failing to warn invitees, including Greenhill, of the dangerous condition of freight elevator #3 and of the differences between that elevator and other elevators in the building.

¶ 16    In count III, Greenhill alleged that TKE owed a duty to exercise ordinary care for the safety of elevator users, which it breached by doing one or more of the following: (1) improperly maintaining, inspecting, or operating the elevators in an unreasonably dangerous condition; (2) failing to properly inspect the elevator; failing to repair the condition of the elevator; (3) failing to timely install a proper sensor or annunciating devices on the elevators; and (4) failing to warn users, including Greenhill, of the dangerous condition of the elevator.

¶ 17    REIT and TKE each filed answers and affirmative defenses. Their affirmative defenses included (1) that Greenhill committed contributory negligence, (2) that Plane was the sole proximate cause of Greenhill's alleged injuries, (3) that the condition of the elevator was "open and obvious," and (4) that pursuant to the 10-year construction statute of repose (735 ILCS 5/13-214 (West 2012)), the defendants did not have an ongoing duty to improve and/or upgrade the sensor or audible warnings. While denying that TKE had any liability toward Greenhill, REIT also alleged in the alternative that TKE breached its duty of care by failing to timely install the electronic door edge and failing to advise REIT that the elevator should have been taken out of service until the electronic door edge or other upgrades were installed.

---

[2]The circuit court granted partial summary judgment in favor of REIT on its breach of contract claims based on TKE's failure to procure the proper insurance. Judge Robert Senechalle ultimately entered a judgment against TKE and in favor of REIT and two insurance companies in the aggregate amount of approximately $385,000, representing the defense costs incurred by or on behalf of REIT. TKE's appeal of that judgment (appeal No. 1-18-2644) is currently pending before this court.

¶ 18                          D. Motions for Summary Judgment—TKE and REIT

¶ 19        TKE filed a motion for summary judgment. First, TKE asserted that it did not breach its duty of care in maintaining the elevator because it had no notice that a dangerous condition existed. Second, TKE argued that Plane's pressing of the "door close" button caused the inner gate to close and strike Greenhill's hardhat. Third, TKE claimed it owed no duty to warn Greenhill of an open and obvious danger, *i.e.*, the closing elevator gate. Fourth, TKE contended that it had no duty to install upgraded sensors or audible devices pursuant to the statute of repose.

¶ 20        In its motion for summary judgment, REIT joined in TKE's arguments. In addition, REIT argued that Greenhill's theory was impermissibly speculative because a frame-by-frame analysis of video footage of the incident did not indicate that Greenhill crossed the gate, and thus, he would not have triggered an electronic door edge, which would have been installed approximately one inch inside the gate. According to REIT, Greenhill's elevator expert Shawn Johnson did not apply a reliable methodology when opining that an infrared beam would have prevented the accident. REIT further asserted that it had no duty to train Plane or to assign a dedicated operator to the elevator and that Greenhill could not establish with reasonable certainty that the presence of an audible signal or flashing light would have prevented the accident.

¶ 21        The support for the motions for summary judgment included the video recording of the occurrence (without audio), multiple depositions, and other documentation.

¶ 22        In a sworn affidavit, Plane averred he was employed by an engineering company and had performed maintenance on generators in the 600 building for two or three years prior to the accident. Plane explained that, in an effort to hold the door open for the man entering the elevator (Fiorito), he held his arm across the elevator's threshold because he "thought the freight elevator had sensors." According to Plane, the elevator appeared to function normally.

¶ 23        During his deposition, Greenhill testified that he had not been in the 600 building prior to the date of his accident. Greenhill did not observe Plane press the "door close" button and did not hear any alarm indicating that the doors were closing before he was hit by the gate. Greenhill's coworker, William Toomey, also testified that he did not recall hearing any alarm or other noises. In an accident report he submitted after the incident, Toomey questioned whether safety devices were present or working properly and also noted that the Power supervisor (Fiorito) had indicated that "this type of accident happened in the past." Fiorito testified that he did not recall any prior incident on freight elevator #3 and no one had complained about the elevator. He also confirmed that contractors like Greenhill were required by REIT to use the freight elevators. Fiorito did not recall whether there was any sound or flashing light associated with the closing of the elevator gate when Greenhill was stricken.

¶ 24        Michael Themanson, Power's safety supervisor, testified that he was not aware of any issue with freight elevator #3 prior to Greenhill's accident. Daniel Soto, the director of security for the building complex, could not recall whether there was an earlier accident on the elevator.

¶ 25        Salvatore "Sonny" Serio, a TKE employee, testified that he spent an average of 15 to 20 hours per week performing elevator maintenance and repair at the 600 building complex in 2012. According to Serio, prior to Greenhill's accident freight elevator #3 was not equipped with a "photo eye" sensor but was equipped with a buzzer to "alert people that the door is going to be closing." Serio explained that pressing the door close button on freight elevator #3 "short timed" (accelerated) the descent of the gate, but the buzzer would still sound. Following

Greenhill's accident, Serio tested freight elevator #3 by initiating a close sequence; he testified that buzzer sounded and the gate properly retracted when it made contact with his hand.

¶ 26    Serio testified that a "photo eye detector" was installed after Greenhill's incident, with a detector edge mounted on one side of the elevator and a transmitter on the other side "a few inches inside" of the gate. According to Serio, the pressing of the door close button should not override the photo eye. Serio opined, however, that even if the photo eye detector had been installed, Greenhill would still have been hit by the gate because he would not have activated the sensor inside the elevator given the manner in which he entered the elevator (based on Serio's review of the elevator video footage).

¶ 27    Serio recalled an incident on freight elevator #6 in February 2012, which led to litigation. Serio speculated that the discussion regarding the installation of the photo eye detector on freight elevator #3 was prompted by the incident on freight elevator #6. He also confirmed that freight elevator #3 was the sole freight elevator without the photo eye protection as of the date of Greenhill's accident. On the date of his deposition in 2016, Serio also was informed of another incident on August 17, 2012, where someone was struck by the gate in freight elevator #3; Serio thought one of his TKE colleagues might have handled that "call." The description of the August incident in the TKE "callback report" was that a passenger was hit on the head by the safety gate in freight elevator #3. The TKE notes indicated that the gate safety edge was checked and was working properly, so the elevator was returned to operation.

¶ 28    Bruce Cassidy, a building engineer employed at the complex, testified regarding the February 2012 incident on freight elevator #6 that "[t]he elevators closed, the woman tripped." Cassidy did not recall any August 2012 incident on freight elevator #3. The day after Greenhill's accident, Cassidy sent an e-mail to Erin Lernihan, TKE's account representative, relaying that the accident might have been avoided if the photo edge was installed. He also testified that, unlike freight elevator #6, there was no "strobe" light on freight elevator #3 at the time of the incident.

¶ 29    Thomas Haney, an elevator consultant who had provided consulting services for various REIT properties, testified that he periodically inspected the elevators at the 600 building before and after Greenhill's accident. Haney testified that freight elevator #3 was modernized in 2011 with "new door equipment," *i.e.*, new mechanical door equipment except for the actual door panel. Haney did not recall whether the elevator had a photo eye system following the 2011 modernization. He surmised, however, that a light ray was in place before Greenhill's incident based on a written proposal from TKE to REIT regarding replacement of a light ray with an electronic edge. Haney testified that the newer style electronic edge had a series of "40, 50, 60" infrared beams, as opposed to one or two beams on the older light ray system. According to Haney, a higher number of beams decreased the likelihood that a passenger would be injured while entering or exiting the elevator. Haney testified, however, that neither a light ray nor an infrared safety edge was required on freight elevator #3 under the applicable safety code. Similar to Serio, Haney testified that an infrared beam would not have prevented Greenhill's accident because he would have been hit by the lowering gate prior to triggering the sensor inside the elevator cab.

¶ 30    Haney's recollection regarding the February 2012 incident on freight elevator #6 was that a woman had tripped on the freight elevator door, not the gate. Haney was not familiar with the August 17, 2012, incident on freight elevator #3.

¶ 31    Although REIT and TKE advanced many of the same arguments in their motions for summary judgment, there are a few noteworthy distinctions. In an affidavit attached to TKE's motion for summary judgment, John Donnelly, an elevator consultant retained by TKE, averred that under the City of Chicago elevator safety code, only "elevator operators" and freight handlers are allowed to use a freight elevator. Donnelly opined that Power or REIT should have provided training regarding safe elevator operation to the authorized personnel using the elevator, including Plane.

¶ 32    In REIT's motion for summary judgment, it noted that TKE had recommended that REIT approve the installation of a "new electronic door edge to replace the existing photo eye door protection." REIT's property manager Kelly Agent signed TKE's proposal on August 22, 2012. REIT noted that the infrared door edge was delivered to TKE in late August 2012, almost a month before Greenhill's accident. Even though the installation of the door edge was a two-hour process, TKE did not complete such installation until after the accident. REIT thus contended it discharged its duty, and liability—if any—would potentially fall on TKE.

¶ 33    In response to TKE's motion for summary judgment, Greenhill asserted that TKE was aware of the dangerous condition of the elevator, *e.g.*, TKE knew freight elevator #3 was the only freight car without the electronic edge. Greenhill also argued that Plane's conduct was foreseeable and was not the sole cause of his injury. Greenhill further contended that the danger was not open and obvious because he was not operating the elevator and did not know the gate was closing. Finally, Greenhill maintained that the construction statute of repose was inapplicable because, among other things, freight elevator #3 was modernized in 2011. In the alternative, Greenhill argued that TKE's motion for summary judgment was premature as neither Plane nor Donnelly was deposed.

¶ 34    Greenhill responded similarly to REIT's motion for summary judgment, but also contended, in part, that REIT "ignores that it had the ultimate responsibility" for elevators on its premises, and REIT—not TKE—owed Greenhill the highest duty of care. In support of his responses, Greenhill submitted the deposition of his elevator expert, Shawn Johnson. According to Johnson, the city's safety code required the installation of an infrared detector if the elevator carried passengers; he characterized Plane and Greenhill as passengers. Johnson opined that "upgrades are part of doing proper maintenance."

¶ 35                    E. The Circuit Court's Rulings

¶ 36    The circuit court granted Superior's motion for summary judgment with respect to TKE's third party complaint, finding, in part, that Superior "owed no duty relative to the freight elevators" and had no notice of any alleged issues with freight elevator #3.

¶ 37    The circuit court granted TKE's motion for summary judgment *vis-à-vis* Greenhill. The circuit court found that the installation of new or better technology on another elevator did not create a duty to install such technology on every elevator. The circuit court further found that there was no evidence that TKE had any notice of a defect in freight elevator #3. Finally, the circuit court found that, based on TKE's contract, it did not have any obligation to train.

¶ 38    The circuit court also granted REIT's motion for summary judgment. Similar to TKE, the circuit court found that REIT's decision to install a light curtain on other elevators did not create a duty to install such device on all elevators. The circuit court also found that there was no notice of a defective condition on the elevator. Furthermore, the circuit court concluded that the danger presented by the freight elevator was open and obvious and that it would be

- 7 -

"unreasonably burdensome" to impose a duty on REIT to train all users of its freight elevators, *e.g.*, construction workers, delivery persons, etc. The circuit court also indicated that there was no evidence presented as to the "distraction exception" to the open and obvious doctrine.

¶ 39                                F. Motion to Reconsider

¶ 40    Greenhill filed a motion for reconsideration of the summary judgment rulings in favor of TKE and REIT, arguing that the circuit court misapplied existing law. Among other things, Greenhill argued that evidence of custom and practice is relevant to establish the standard of care and that the defendants, by installing the edge on other freight elevators, established that the standard of care in relation to the freight elevators was to have the infrared edge. Greenhill further contended that the occurrence was not open and obvious and that the open and obvious doctrine was not implicated in all negligence cases but is a defense to premises liability cases. Greenhill also argued that even if the court found that there was an open and obvious danger, its analysis is incomplete until it has considered the four traditional duty factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of injury, (3) the magnitude of guarding against the injury, and (4) the consequence of placing the burden on the defendants. Finally, Greenhill asserted that the "distraction exception" and the "deliberate encounter" exceptions to the open and obvious rule applied.

¶ 41    On May 21, 2018, the circuit court entered an order denying the motion to reconsider. Pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), the order provided that as to the summary judgment rulings regarding REIT, TKE, and Superior, there was no just reason to delay enforcement or appeal. Greenhill filed a timely notice of appeal, and TKE filed a timely notice of cross-appeal.

¶ 42                                   II. ANALYSIS

¶ 43    Greenhill contends on appeal that the circuit court erred in granting summary judgment in favor of REIT and TKE. In support of his contention, he raises three primary arguments: (i) the defendants owed him a duty, (ii) the danger was not open and obvious, and (iii) the defendants' breaches of duty were a proximate cause of his injury. As discussed further below, different standards of care are applicable to REIT and TKE, and certain theories are available or applicable *vis-à-vis* REIT as the building owner/manager, and not TKE. We begin with a brief discussion of summary judgment standards.

¶ 44                            A. Summary Judgment Standards

¶ 45    Summary judgment is proper when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016). "The purpose of summary judgment is not to try an issue of fact but to determine whether one exists." *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Summary judgment is a drastic means of disposing of litigation and should only be allowed when the right of the movant is clear and free from doubt. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22; *Monson*, 2018 IL 122486, ¶ 12. In ruling on a summary judgment motion, we must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Beaman*, 2019 IL 122654, ¶ 22. "On appeal from an order granting summary judgment, a reviewing court must consider whether the existence of a genuine issue

of material fact should have precluded dismissal or, absent such an issue of fact, whether summary judgment is proper as a matter of law." *Monson*, 2018 IL 122486, ¶ 12. We review the circuit court's summary judgment ruling *de novo*. *Id.* "*De novo* consideration means we perform the same analysis that a trial judge would perform." *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 41.

¶ 46                                                    B. Negligence Principles

¶ 47        In a negligence action, the plaintiff must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from the breach. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12; *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007); *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). Whether a duty exists in a particular case is a question of law for the court to decide. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 14; *Marshall*, 222 Ill. 2d at 430; *Carlson v. Chicago Transit Authority*, 2014 IL App (1st) 122463, ¶ 24. Conversely, whether a defendant breached the duty and whether the breach was the proximate cause of the plaintiff's injuries are factual matters for the jury to decide, provided there is a genuine issue of material fact regarding those issues. *Marshall*, 222 Ill. 2d at 430; *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 441 (1990); see also *Carlson*, 2014 IL App (1st) 122463, ¶ 26 (noting that breach and proximate cause are ordinarily questions of fact for the jury, but "factual questions become questions of law when there can be no difference in the judgment of reasonable men on inferences to be drawn from undisputed facts").

¶ 48                                                    1. Duty and Breach

¶ 49        Greenhill advances multiple arguments in support of his contention that REIT and TKE each owed a duty to him. He initially contends that the Illinois Supreme Court has already determined that a duty is owed under the circumstances herein. He also argues that evidence of custom and practice is relevant to establish the standard of care and the defendants' duty, *i.e.*, the defendants' own conduct demonstrates the standard of care. He next asserts that freight elevator #3 did not comply with the City of Chicago municipal code regarding freight elevators. He also contends that the deposition testimony of Johnson, his elevator expert, established the defendants' duty and their breach thereof. Greenhill then argues that the defendants owed him a duty to warn him of the condition of freight elevator #3 and the differences from the other elevators in the complex. Finally, he asserts that the defendants voluntarily assumed the duty to "repair and upgrade" freight elevator #3 with an infrared detection edge.

¶ 50        REIT and TKE claim that Greenhill is raising certain of the foregoing arguments for the first time on appeal, including (1) compliance with the municipal code, (2) consideration of the role of expert testimony in establishing the standard of care, (3) the duty to warn, and (4) the voluntary assumption of a duty of care. "An argument that has not been raised in the trial court cannot be raised for the first time on appeal, even in the case of a summary judgment." *Village of Palatine*, 2012 IL App (1st) 102707, ¶ 64. We need not examine whether these particular arguments were previously raised, however, because their resolution is not necessary for our analysis herein.

¶ 51        The concept of duty in negligence cases has been described as "involved, complex, and nebulous." *Simpkins*, 2012 IL 110662, ¶ 17; see also *Buchaklian v. Lake County Family Young*

*Men's Christian Ass'n*, 314 Ill. App. 3d 195, 200 (2000) (stating that "our extensive research and review of cases in this area of law have led us to conclude that the concept of 'duty' in negligence cases is a clear as mud"). The standard of care—also known as the standard of conduct—falls within the duty element. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 294-95 (2000). "What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." (Emphasis and internal quotation marks omitted.) *Id.* at 295 (quoting William L. Prosser, Handbook of the Law of Torts § 53, at 324 (4th ed. 1971)).

¶ 52 The touchstone of our duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed on the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *Forsythe*, 224 Ill. 2d at 280-81. Four factors inform this inquiry: (1) the reasonable foreseeability of injury, (2) the likelihood of injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden upon the defendant. *Id.* at 281 *Garest v. Booth*, 2014 IL App (1st) 121845, ¶ 27 (noting that the four factors are typically considered in determining whether a duty exists).

¶ 53 Furthermore, our supreme court has recognized certain "special relationships" that give rise to a duty of care. *Simpkins*, 2012 IL 110662, ¶ 20; see also *Stearns v. Ridge Ambulance Service, Inc.*, 2015 IL App (2d) 140908, ¶ 18. One such relationship is between a common carrier and a passenger. See *Carlson*, 2014 IL App (1st) 122463, ¶ 24 (noting that although a common carrier is not an insurer of the absolute safety of a passenger, Illinois courts have long held that a common carrier has a duty to its passengers to exercise the highest degree of care consistent with the practical operation of its conveyances).

¶ 54 As the owner/manager of a building with elevators, REIT was a common carrier with a nondelegable duty to exercise the highest degree of care. *Jardine v. Rubloff*, 73 Ill. 2d 31, 41 (1978); see also *Carlson*, 2014 IL App (1st) 122463, ¶ 28 (noting that "[a]lthough an accident that results in injuries to passengers aboard a common carrier may raise a presumption that the carrier was negligent, the carrier may present evidence to rebut that presumption"). A company that performs elevator maintenance and inspections, however, "need only exercise due care." *Jardine*, 73 Ill. 2d at 41. TKE's conduct must be tested against the care a reasonably careful person would use under the circumstances. *Id.* at 42; see also *Stines v. Otis Elevator Co.*, 104 Ill. App. 3d 608, 610-11 (1982) (noting that a company which performs elevator maintenance or inspections may be held liable for negligence).

¶ 55 In its appellate brief, REIT does not address its common law duty to exercise the highest degree of care. REIT instead frames our inquiry as whether a court should impose a "duty to upgrade" on a property owner or manager. The Illinois Supreme Court in *Marshall*, 222 Ill. 2d at 430, however, expressly found that duties are not to be formulated so narrowly. In *Marshall*, a restaurant patron was killed when a vehicle drove through the restaurant wall. *Id.* at 424. The patron's estate sued the restaurant company and the franchisee, alleging that they did not exercise due care in designing, constructing, and maintaining the restaurant. *Id.* at 426. The circuit court granted the defendants' motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2002)); the appellate court reversed and remanded for further proceedings. Marshall, 222 Ill. 2d at 427. In affirming the judgment of the appellate court, our supreme court concluded that "the issue in this case is not whether defendants had a duty to install protective poles, or a duty to prevent a car from entering the restaurant, or some such other fact-specific formulation." *Id.* at 443. Because of the "special relationship" between the defendants and decedent—*i.e.*, the relationship between a business invitor and invitee—

our supreme court concluded that the defendants owed the decedent a duty of reasonable care. *Id.*

¶ 56     Like the defendants in *Marshall*, REIT attempts to frame its duty in limited terms, *i.e.*, whether it owed a duty to upgrade freight elevator #3 because it had previously upgraded the other freight elevators. This formulation, however, is inconsistent with *Marshall* and effectively ignores the common law duty of care owed by REIT to Greenhill by virtue of its status as a common carrier. The issue herein is thus whether REIT (and TKE), in light of the particular circumstances of this case, *breached* their respective duties to Greenhill. See *Marshall*, 222 Ill. 2d at 443-44. As noted above, whether a defendant breached its duty generally is a question of fact for resolution by a jury. *Deibert*, 141 Ill. 2d at 441; see also *Stearns*, 2015 IL App (2d) 140908, ¶ 13 (observing that the *Marshall* court recognized that "purely *ad hoc* determinations that a defendant had a duty to perform or refrain from performing particular acts improperly conflate the concepts of duty and breach").

¶ 57     Although REIT owed a higher standard of care to Greenhill than TKE, the same reasoning applies to TKE. Similar to REIT, TKE contends that it did not owe a duty to Greenhill. Specifically, TKE asserts that its maintenance agreement with REIT excluded a duty to upgrade from the scope of TKE's work. Such contention ignores its common law duty to passengers as a provider of elevator maintenance services (*Jardine*, 73 Ill. 2d at 41) and improperly conflates the concepts of duty and breach (*Marshall*, 222 Ill. 2d at 443-44; *Stearns*, 2015 IL App (2d) 140908, ¶ 13). Furthermore, Greenhill did not charge TKE with negligence based on its violation of TKE's maintenance agreement with REIT; rather, Greenhill contends that a duty was owed based on his status as a passenger on an elevator maintained by TKE. See *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 84 (1964) (noting that Illinois has "refused to permit the ancient shield of privity to insulate a tort feasor from the consequences of his negligent conduct").

¶ 58     TKE further contends that, even assuming it owed a duty to Greenhill, summary judgment is not proper because TKE did not breach the duty. Citing *Davlan v. Otis Elevator Co.*, 816 F.2d 287, 291 (7th Cir. 1987), TKE asserts that "[i]n the context of an elevator maintenance company, breach of duty must be established by showing" that (1) the company had prior knowledge of the problem or (2) the company did not use reasonable care in maintaining the elevators by failing to discover and correct the problem. TKE contends that it did not have notice of a defect or malfunction on freight elevator #3 and thus did not breach its duty, if any, to Greenhill.

¶ 59     TKE's reliance on *Davlan*, however, is not persuasive. We initially observe that a federal circuit court decision is not binding on this court. *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 835 (2004). Furthermore, as Greenhill's claim against TKE is for negligence, rather than premises liability—because TKE was not the landowner—Greenhill arguably is not required to prove that TKE had notice of a hazardous condition. See, *e.g.*, *Garest*, 2014 IL App (1st) 121845, ¶ 32. In any event, a genuine issue of material fact exists as to whether TKE had notice of the condition of the elevator. The record indicates that approximately five weeks before Greenhill's accident, a TKE employee inspected the elevator after another passenger was struck by the gate in freight elevator #3. As a result, there is an issue of fact as to whether TKE had notice and knowledge of a dangerous condition on the elevator. Based on the record herein, the question of whether TKE breached its duty is a question of fact that precludes the entry of summary judgment. See *Stearns*, 2015 IL App (2d)

140908, ¶ 19.

¶ 60                                                    2. Open and Obvious

¶ 61        Greenhill next contends that the danger was not open and obvious. "In Illinois, the open and obvious doctrine is an exception to the general duty of care owed by a landowner." *Park v. Northeast Illinois Regional Commuter R.R. Corp.*, 2011 IL App (1st) 101283, ¶ 12. Under the open and obvious rule, a party who owns and controls land is not required to foresee and protect against an injury if the potentially dangerous condition is open and obvious. *Bruns*, 2014 IL 116998, ¶ 16. "When a condition is deemed open and obvious, the likelihood of injury is generally considered slight as it is assumed that people encountering potentially dangerous conditions that are open and obvious will appreciate and avoid the risks." *Park*, 2011 IL App (1st) 101283, ¶ 12. The open and obvious rule is not limited to common conditions such as fire, height, and bodies of water; other conditions may also constitute open and obvious dangers. *Bruns*, 2014 IL 116998, ¶ 17.

¶ 62        Where there is no dispute about the physical nature of the condition, whether a danger is open and obvious is generally a question of law. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 34; see also *Duffy v. Togher*, 382 Ill. App. 3d 1, 8 (2008) (noting that when a court cannot conclude as a matter of law that a condition posed an open and obvious danger, then the obviousness of the danger is for the trier of fact to determine).

¶ 63        Open and obvious is not an automatic or *per se* bar to finding a legal duty on the part of a defendant. *Bruns*, 2014 IL 116998, ¶ 19. In assessing whether a duty is owed, the court must still apply the four-factor traditional duty analysis to the particular facts of the case: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the injury, and (4) the consequences of placing that burden on the defendant. *Bruns*, 2014 IL 116998, ¶¶ 14, 19; see also *Henderson v. Lofts at Lake Arlington Towne Condominium Ass'n*, 2018 IL App (1st) 162744, ¶ 41 (noting that the existence of a duty in the face of a known or obvious condition is subject to the same analysis of a duty as is necessary in every claim of negligence, requiring analysis of the same four duty factors). "Where the condition is open and obvious, the foreseeability of the harm and the likelihood of injury will be slight, thus weighing against the imposition of a duty." *Bruns*, 2014 IL 116998, ¶ 19.

¶ 64        Greenhill initially argues that the open and obvious defense is unavailable to REIT because its duties arise from general tort law and its status as a common carrier. According to Greenhill, "the open and obvious nature of a danger is not implicated in all negligence cases but is a defense to premises liability cases only." We recognize that, under circumstances where a landowner's conduct in creating an unsafe condition precedes the plaintiff's injury, a plaintiff may elect to pursue a negligence claim, a premises liability claim, or both. *Smart v. City of Chicago*, 2013 IL App (1st) 120901, ¶ 54; *Atchley v. University of Chicago Medical Center*, 2016 IL App (1st) 152481, ¶ 32 n.4. "[P]laintiffs are the masters of their complaint and are entitled to proceed under whichever theory they decide, so long as the evidence supports such a theory." (Internal quotation marks omitted.) *Smart*, 2013 IL App (1st) 120901, ¶ 54.

¶ 65        Greenhill relies on *Smart*, 2013 IL App (1st) 120901, ¶ 56, which provides that a "claim that the unreasonably dangerous condition of property proved by the plaintiff was open and obvious is a defense to a premises liability claim." Contending that "open and obvious" is a defense to a *premises liability* claim—but he is proceeding against REIT primarily on a *negligence* theory—Greenhill argues that the open and obvious defense is unavailable to REIT.

Recent decisions have rejected this proposition. See *Lee v. Lee*, 2019 IL App (2d) 180923, ¶¶ 20-25; see also *Atchley*, 2016 IL App (1st) 152481, ¶ 32 (concluding that the "open and obvious doctrine pertains to the element of duty in a negligence action").

¶ 66       We now turn to the merits of REIT's open and obvious defense. As noted above, where there is a dispute about the condition's physical nature, such as its visibility, the question of whether a condition is open and obvious is factual, not legal. *Choate*, 2012 IL 112948, ¶ 34; *Park*, 2011 IL App (1st) 101283, ¶ 15. Despite REIT's contentions to the contrary, the parties appear to dispute the physical nature of the elevator. The elevator passengers testified that they did not hear—or at least did not recall hearing—any sound as the gate descended. Conversely, TKE employee Serio testified that the "audible was functioning" when he tested the elevator shortly after Greenhill's accident. The record is also unclear as to whether freight elevator #3 was equipped with a sensor as of the time of the accident. Serio testified that there was no photo eye detector in freight elevator #3 as of the date of the accident. Conversely, TKE's elevator consultant Haney surmised that there was a "light ray" in place. Plane—who previously had ridden freight elevator #3—averred that he held his arm across the elevator threshold for Fiorito to enter because he thought freight elevator #3 "had sensors."

¶ 67       Even if we were to assume, however, that the elevator was in the fully functional condition described by REIT, the open and obvious defense would nevertheless be unavailable. In addressing the obviousness of a condition, "the term 'obvious' means that both the condition and the risk are apparent to and would be appreciated by a reasonable person in the plaintiff's position exercising ordinary perception, intelligence, and judgment." *Simmons v. American Drug Stores, Inc.*, 329 Ill. App. 3d 38, 43 (2002); see also *Bruns*, 2014 IL 116998, ¶ 16. REIT contends that "[c]onsistent with Illinois law, the fact that the freight elevator had doors and a gate that open and close was open and obvious to anyone exercising ordinary perception, intelligence, and judgment." The issue, however, is whether the *condition* and the *risk* are apparent to a reasonable person. We find that the risk herein was not apparent. A person entering freight elevator #3, who did not view Plane pressing the door close button causing the lowering of the gate, would not be able to appreciate the risk of being struck by the gate. Although we recognize that the obviousness of the danger is not based on the plaintiff's own subjective perception but by an objective standard (*Simmons*, 329 Ill. App. 3d at 43), we note that Greenhill testified that he did not observe Plane pressing the button.

¶ 68       REIT's reliance on *Murphy v. Ambassador East*, 54 Ill. App. 3d 980 (1977), is not persuasive. The plaintiff in *Murphy* was a police officer called to a hotel to remove a body from one of the rooms. *Id.* at 982. The hotel's manager requested that the body be removed by transporting it on a freight elevator. *Id.* The manager directed the plaintiff and his partner to the freight elevator, which was standing with its doors open at the level of the loading dock. *Id.* When the manager unsuccessfully attempted to operate the elevator, he left the plaintiff on the dock and went upstairs to determine if an open door prevented operation. *Id.* The manager indicated he would bring the elevator upstairs and then return for the officers. *Id.* After waiting a few minutes, the plaintiff concluded that in order for the elevator to move, the doors would have to be closed. *Id.* When he attempted to shut the doors, he caught his hand between them and was injured. *Id.* In affirming the grant of summary judgment in favor of the hotel and its codefendants, the court found that the defendants "were under no duty to protect plaintiff from this particular danger, *i.e.*, that of catching his hand in the normally operating elevator doors." *Id.* at 985.

¶ 69    Unlike the plaintiff in *Murphy*, Greenhill was not injured after making a conscious decision after a few minutes to manually shut the elevator doors. Greenhill was struck within a second or two of another individual pressing the "door close" button. As noted above, the open and obvious doctrine has no applicability here because Greenhill did not know the button was being pressed. We further note that *Murphy* was decided prior to *Jardine*, a seminal Illinois Supreme Court decision regarding the duties surrounding elevators, including the heightened duties of common carriers. *Jardine*, 73 Ill. 2d 31. For the foregoing reasons, we conclude that the circuit court erred in determining, as a matter of law, that the open and obvious doctrine was available to REIT.

¶ 70    The open and obvious doctrine is also unavailing for TKE, but for a different reason. Since TKE is not the landowner, we reject TKE's contention that it may avail itself of the open and obvious defense. See, *e.g.*, *Garest*, 2014 IL App (1st) 121845, ¶ 32 (noting that because the independent contractor that constructed the building where plaintiff was injured "cannot be considered a landowner in this case, it follows that [the contractor] is unable to avail itself of arguments pertaining to landowners that are based on premises liability principles"). We next turn to the issue of proximate cause.

¶ 71                                    3. Proximate Cause

¶ 72    Greenhill contends that the defendants' breaches of duty were the proximate cause of his injury. REIT responds that Greenhill's theory—that an electronic door edge or an audible signal and/or light would have prevented the accident—is "speculative." According to TKE, Plane's actions were the sole proximate cause of Greenhill's injuries.

¶ 73    "A proximate cause analysis involves two aspects, both of which a plaintiff must show in order to recover: cause-in-fact and legal cause." *Freeman v. City of Chicago*, 2017 IL App (1st) 153644, ¶ 39. Cause-in-fact exists when there is reasonable certainty that a defendant's acts caused the damage or injury. *Id.* Courts use either the "but for" test or the "substantial factor" test in considering whether conduct is a cause-in-fact of a plaintiff's injury. *Id.* Under the "but for" test, a defendant's conduct is not the cause of an event if the event would have occurred without it. Under the "substantial factor" test, the defendant's conduct is deemed to be a cause of an event if it was a substantial factor and a material element in bringing about the event. *Id.* In contrast, legal cause involves an assessment of foreseeability. *Id.* ¶ 40. A negligent act is a legal proximate cause of an injury if the injury is of the type that a reasonable person would foresee as a likely result of his conduct. *Id.*

¶ 74    In its appellate brief, REIT includes a series of frame-by-frame images from the accident (taken from the elevator video footage), which purportedly demonstrate that—contrary to Greenhill's expert Johnson's testimony—Greenhill's legs would not have crossed the threshold and triggered the electronic door edge prior to the impact of the gate. Even if we were able to interpret the images in the manner suggested by REIT, such fact-specific determinations are not proper on a motion for summary judgment. *Monson*, 2018 IL 122486. ¶ 12.

¶ 75    TKE contends that Plane's conduct was the sole proximate cause of Greenhill's injuries. However, it is fundamental in the law of negligence that there may be more than one proximate cause of an injury and that a defendant may be liable for its negligent conduct, whether it contributed in whole or in part to the plaintiff's injury, so long as it was one of the proximate causes of the injury. *Nelson*, 31 Ill. 2d at 88; see also *Kunz v. Little Co. of Mary Hospital &*

*Health Care Centers*, 373 Ill. App. 3d 615, 622 (2007) (noting that a defendant may be held liable if its conduct contributed in whole or in part to the injury). "Regarding a third-party's acts, the subsequent act of a third-party does not break the causal connection between a defendant's negligence and a plaintiff's injury if the subsequent act was probable and foreseeable." *Id.* In the instant case, it was arguably foreseeable that a passenger on freight elevator #3 would press the "door close" button to initiate a quicker close. If the defendants had installed the new electronic door edge—which TKE apparently had received the prior month—the door edge (or a properly functioning buzzer or light) *might* have prevented the accident.

¶ 76    While proximate cause may be determined as a matter of law where the facts show that the plaintiff would never be entitled to recover, proximate cause is generally an issue of material fact to be determined by the jury. *Garest*, 2014 IL App (1st) 121845, ¶ 41. In the instant case, the genuine issues of material fact regarding proximate cause preclude the entry of summary judgment.

¶ 77                                   C. Motion to Reconsider

¶ 78    Greenhill filed a motion to reconsider the circuit court's grant of summary judgment in favor of REIT and TKE. The purpose of a motion to reconsider is to bring to the circuit court's attention (1) newly discovered evidence not available at the time of the hearing, (2) changes in the law, or (3) errors in the court's previous application of existing law. *Stringer v. Packaging Corp. of America*, 351 Ill. App. 3d 1135, 1140 (2004). For the reasons discussed herein, we are reversing the grant of summary judgment in favor of REIT and TKE and remanding this matter to the circuit court for further proceedings. We therefore need not consider Greenhill's arguments regarding the denial of his motion to reconsider.

¶ 79                       D. TKE's Third-Party Complaint Against Superior

¶ 80    Since we have reversed the grant of summary judgment in favor of TKE, we must address TKE's appeal from the grant of summary judgment in favor of Superior on TKE's third-party claim. According to TKE, Superior owed a nondelegable duty to use ordinary care to provide its employees with a reasonably safe workplace, including the "customary passageways" used by employees to travel from one part of the premises to the other in the course of employment. *E.g.*, *Dickey v. Commonwealth Edison Co.*, 149 Ill. App. 3d 242, 244 (1986); *Coselman v. Schleifer*, 97 Ill. App. 2d 123, 126 (1968). TKE specifically contends that Superior should have warned or trained its employees about the use of the elevator, trained its employees regarding proper operation of the elevator, or restricted the use of the elevator to trained employees.

¶ 81    We find that even assuming that Superior breached a duty of care to Greenhill, the record does not indicate that the breach was a proximate cause of Greenhill's injury. There is no evidence in the record that Superior's failure to properly train, instruct, or supervise its employees contributed to the accident in any manner. *Taake v. WHGK, Inc.*, 228 Ill. App. 3d 692, 712 (1992). Absent proof of a causal relationship between Superior's alleged breach and Greenhill's injury, TKE cannot establish the element of proximate cause. Although the circuit court did not primarily base its ruling on the proximate cause element, a reviewing court may affirm a circuit court's grant of summary judgment on any basis supported by the record. *Travelers Personal Insurance Co. v. Edwards*, 2016 IL App (1st) 141595, ¶ 20.

¶ 82                    III. CONCLUSION

¶ 83      For the reasons stated herein, we (1) reverse the grant of summary judgment in favor of
REIT and TKE and remand this matter for further proceedings and (2) affirm the grant of
summary judgment in favor of Superior.

¶ 84      Affirmed in part and reversed in part. Cause remanded.